In the Supreme Court of Georgia

Decided:   October 20, 2014

S14A1054.  JUSTIN MILES WINGATE v. THE STATE.

NAHMIAS, Justice.

Justin Wingate appeals his convictions for the murder and armed robbery of Michael Wilkins.[1]  We affirm.

1.     (a)     Viewed in the light most favorable to the verdict, the evidence presented at trial showed the following. Wilkins was Appellant's godfather;

[1] The victim was killed on January 23, 2010.  On June 8, 2010, a Bibb County grand jury indicted Appellant, Adrian Sparrow, Tavion Simms, and Shantia Horton for malice and felony murder and armed robbery.  Appellant was tried first, from January 31 to February 3, 2011, and the jury found him guilty of malice murder and armed robbery.  On March 22, 2011, the trial court sentenced Appellant to serve two concurrent terms of life imprisonment.  On April 13, 2011, he filed a motion for new trial.  Appellant was then appointed new counsel, who filed an amended motion for new trial on February 13, 2013 and another amendment on April 18, 2013.  After two hearings, the trial court denied the motion as amended on February 20, 2014.  Appellant filed a timely notice of appeal, and the case was docketed to this Court for the April 2014 Term and submitted for decision on the briefs.

On the third day of Appellant's trial, Horton accepted a plea agreement under which the murder charge against her was nolle prossed and she pled guilty to the reduced charge of robbery by force in exchange for her testimony against her co-indictees.  Sparrow and Simms were granted immunity for their testimony and ordered by the trial court to testify at Appellant's trial.  Sparrow testified against Appellant and then entered a guilty plea about a month after Appellant was sentenced; the record does not indicate to what charge(s) Sparrow pled guilty.  Simms refused to testify and was later convicted of 30 counts of contempt of court and sentenced to 600 days in jail and a $5,000 fine; the record does not indicate how the indictment against him was resolved.

Appellant sometimes referred to him as "daddy." Wilkins had dated Appellant's mother, and he remained in contact with Appellant after the relationship ended. On Saturday, January 23, 2010, Shantia Horton drove Appellant, Adrian Sparrow, and Tavion Simms from Decatur, where they lived, to Macon, where Wilkins lived alone, in her car. Appellant told his friends that he wanted to get money from Wilkins. Horton testified that Appellant said his godfather would not be home when they arrived, and she did not think that the visit was "robbery-type." Sparrow told the police, however, that Appellant said that he was planning to rob his godfather.

According to Horton's trial testimony and Sparrow's statement to the police, the following happened once the group arrived at Wilkins's house. Appellant went inside the house alone. After about 20 minutes, Sparrow and Simms also got out of the car. Simms went into the house, while Sparrow stayed in the driveway. Horton and Sparrow did not hear any gunshots. About five minutes later, Appellant, Simms, and Sparrow returned to the car. Appellant indicated that he had gotten $14,000, and he gave $3,000 in $100 bills to each of his companions. When asked how he got the money, Appellant said, "I did what I had to do." The group then returned to Decatur, arriving around

2

4:00 p.m.[2]

Two days later, on Monday, January 25, after Wilkins did not show up for work or answer his phone or door, a co-worker and a neighbor together called the police, who found Wilkins dead in his house. He had been killed by a single gunshot to the back of his head as he was going down the stairs toward his basement and the door leading to the garage. When the police arrived at the house, Wilkins's Toyota Tundra truck was parked in the driveway, neatly covered with a cloth cover; his Land Cruiser was in the garage; and the doors to the house were locked. There were no signs of forced entry; the police determined that the front door automatically locked when shut. The interior of the house was largely undisturbed, and Wilkins's wallet, high-end electronics, keys to the Land Cruiser, and $387 in cash in the top drawer of his dresser all appeared untouched. However, his mattress had been moved, as if someone was looking under it, and a small safe in his bedroom closet was open and contained only papers; it did not appear that the safe had been pried open. At trial,

---

[2] In his testimony at trial, Sparrow contradicted the statement he gave to the police in several ways. He claimed that Appellant had said that he wanted to drive to Macon to get the money Wilkins had promised him for his birthday, that only Appellant went in the house, and that he did not know how much money Appellant got. He also said that Appellant did not say he "did what he had to do" and that, as the group was driving away, Wilkins came to the door and waved.

Wilkins's brother and two neighbors testified that he usually kept cash in a safe in the house. Investigators found a cartridge casing from an semi-automatic gun near Wilkins's body, and they later found bullet fragments and a shell casing from a 9mm gun under the carpet where Wilkins had been found lying.

The co-worker who had called the police told them that she had been on the phone with Wilkins on January 23 and that he ended the call by saying that his godson had arrived. Phone records showed that Appellant's cell phone was present near Wilkins's home between 2:19 and 2:34 p.m. on January 23, 2010, and the GPS in Horton's car showed directions to a location in Macon. Appellant's roommate testified that when Appellant returned home that night, he had a "rubber band of money" and gave the roommate two $100 bills; Appellant would not say where he got the money. Four days after the Macon trip, Sparrow was found to have $1,800 in $100 bills. Both Horton and the roommate testified that Appellant owned a semi-automatic gun.

(b)     Appellant argues that he should not have been convicted of robbing and murdering Wilkins because the evidence presented by the State was circumstantial and in some respects supported his defense that he went to see Wilkins to get a gift of money, not to steal it, and the evidence also showed

4

without contradiction that he had a close relationship with Wilkins. However, "'[i]t was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) (citation omitted). And evidence that Wilkins and Appellant had a relationship like father and son is not inconsistent with a finding that Appellant killed Wilkins; as a review of this Court's murder cases would demonstrate, even close blood relatives kill each other with unfortunate frequency. Our review of the record confirms that the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Appellant contends that he is entitled to a new trial on the ground that the trial court erred in denying his motion to suppress evidence that $1,817 was found in his pocket after he was arrested on a marijuana possession charge at his high school five days after the Macon trip, because the cash was seized as a result of a Fourth Amendment violation. We agree that this evidence should have been suppressed, but we conclude that the error was harmless.

5

(a)    As mentioned previously, the victim's co-worker told police that the victim ended their call on January 23, 2010 by saying that his godson had arrived at his house. After learning Appellant's name from the victim's brother, on January 27, 2010 Macon police investigators went to Southwest DeKalb High School, where Appellant was a student, to speak with him. They were not able to interview Appellant that day because he had left school early, but they notified Deputy T.L. Wortham, a POST-certified law enforcement officer working as a school resource officer (SRO), that they wanted to speak with Appellant. The next day, Appellant and his mother reported to the counseling office because he had been absent from classes without excuse the day before. Deputy Wortham went to the counseling office and explained to Appellant and his mother that some officers from Macon were coming to speak with him. Deputy Wortham then led Appellant and his mother to the SRO office. At some point, the officer cuffed Appellant's hands, explaining to him that handcuffing was necessary because the officer had other school duties to attend to and because Appellant had left school early without excuse the day

6

before.[3]

Deputy Wortham then left Appellant unattended and handcuffed in the SRO office with the door open while he went to wait at the front security desk for the second SRO to arrive at school. When Deputy Wortham returned to the SRO office, he found a bag of marijuana on the floor near the stool on which Appellant was sitting that had not been there before. Deputy Wortham then arrested Appellant for possession of marijuana, searched him incident to the arrest, and found $1,817 in his pocket, consisting of 18 $100 bills and a few smaller bills.

(b)     The trial court denied Appellant's motion to suppress the money evidence, holding that it was admissible as the product of a lawful search because Appellant was not detained when he abandoned the marijuana that was the basis for his arrest and the search of his pocket.[4] The court concluded that

---

[3] It is unclear from the record whether Appellant was handcuffed before or after Deputy Wortham led him to the SRO office. The record also does not indicate whether Appellant's mother stayed with him in the SRO office, although she was at the school when the Macon officers arrived later that morning.

[4] After Appellant's arrest on the marijuana charge, the Macon police arrived and Appellant gave them a statement. In response to a motion to suppress, the State agreed not to use that statement at trial. In addition, the trial court granted Appellant's motion to exclude evidence of the marijuana, deeming it irrelevant and prejudicial.

7

Appellant had not been seized when Deputy Wortham left him handcuffed in the SRO office because he had gone to the office voluntarily and the officer told Appellant that he was not under arrest and left the office door open. This conclusion was erroneous, because the trial court failed to appreciate how Appellant's freedom to leave the office was hampered by the handcuffs that the officer had put on him.

The State argues that Deputy Wortham's use of handcuffs did not turn his interaction with Appellant into a Fourth Amendment seizure. Many of the cases cited to support this argument, however, stand only for the proposition that the use of handcuffs does not necessarily convert a second-tier, investigatory stop – which is already a seizure, albeit a brief and limited one – into a full-fledged arrest. See, e.g., Stringer v. State, 285 Ga. 842, 844-845 (684 SE2d 590) (2009) ("'[O]fficers may handcuff a suspect during an investigatory stop when such action is either reasonable under the circumstances to protect themselves or the public or to maintain the status quo.'" (citation omitted)). See also In re D.H., 285 Ga. 51, 53 (673 SE2d 191) (2009) ("There are at least three types of police-citizen encounters: verbal communications that involve no coercion or detention; brief 'stops' or 'seizures' that must be accompanied by a reasonable

8

suspicion; and 'arrests,' which can be supported only by probable cause." (citation and quotation marks omitted)). These cases are inapplicable here because there is no evidence that Deputy Wortham had the reasonable suspicion that Appellant was or had been engaged in criminal activity that is necessary to justify a second-tier stop. See Stafford v. State, 284 Ga. 773, 774 (671 SE2d 484) (2008) (explaining that a second-tier stop requires "'reasonable, articulable suspicion that a crime may have been committed'" (citation omitted)). The Macon police had simply asked to speak with Appellant; there is no evidence that they told Deputy Wortham that there was a pending charge against Appellant or any other reason to detain him, nor did the deputy have any independent reason to suspect Appellant of a crime before handcuffing him.

The State also cites cases where we held that the use of handcuffs did not convert a first-tier encounter into a seizure when a defendant who voluntarily consented to be interviewed was handcuffed during transportation to the police station in the back of a police car, because such a measure was reasonable to protect officer safety and the handcuffs were removed before the evidence as to which the defendant sought suppression was obtained. See Bolden v. State, 278 Ga. 459, 462-463 (2004). See also Smith v. State, 281 Ga. 185, 187 (640 SE2d

9

1) (2006) (finding no unlawful seizure even assuming the appellant had been handcuffed for transport).[5]

In this case, however, there is no evidence that cuffing Appellant's hands together was necessary to protect Deputy Wortham or anyone else, or that it could serve that purpose after the officer left Appellant behind in the unlocked SRO office to go to the front desk. Indeed, Deputy Wortham offered no reason for handcuffing Appellant other than explaining that it was the general practice for SRO officers at the school to handcuff students they had to leave unattended.[6] And even assuming that the school police officer's taking this student to wait in the SRO office until Macon police officers arrived to question him did not result in Appellant being detained, leaving him there in handcuffs did. Appellant may have been free to move about the SRO office, but a reasonable person would not feel free to leave, even through an open door, to

---

[5] The State also cites a case in which the Court of Appeals noted in dicta that briefly detaining at gunpoint two men who were not suspected of illegal activity was "justified by the need to protect the safety of the officers and the detained men" because the men were on the sidewalk outside an apartment that other officers were lawfully searching. <u>Hunter v. Lee</u>, 244 Ga. App. 488, 491 n.1 (536 SE2d 157) (2000). Even assuming that dicta was correct, it would not lead to a different conclusion on the facts of this case.

[6] If such a practice of routinely handcuffing students who are not reasonably suspected of misconduct exists, we do not endorse it.

walk through his school when he was marked by handcuffs that signify an escaped detainee and that cannot easily be removed. See Jones v. State, 291 Ga. 35, 37 (727 SE2d 456) (2012) ("A consensual encounter may become a seizure under the Fourth Amendment when 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" (citation omitted)). Moreover, unlike the situation in cases like Bolden, by leaving Appellant behind in the office, the officer prevented Appellant from being in a position to ask for the handcuffs to be removed so that he could leave. See Bolden, 278 Ga. at 463. Put simply, a reasonable person would not "feel free to 'disregard the police and go about his business'" when left in a room in a school wearing handcuffs that the police had locked onto him. Jones, 291 Ga. at 37 (2012) (quoting Florida v. Bostick, 501 U.S. 429, 434 (111 SCt 2382, 115 LEd2d 389) (1991)).

Under these circumstances, we conclude that Appellant was seized in violation of the Fourth Amendment when Deputy Wortham left him handcuffed in the SRO office, even if the officer did not subjectively intend to detain Appellant. See State v. Fisher, 293 Ga. App. 228, 230 (666 SE2d 594) (2008). Because Appellant was unlawfully detained at the time he apparently discarded

11

the marijuana, the marijuana was the product of an unlawful seizure. See

Edwards v. State, 239 Ga. App. 44, 45 (518 SE2d 426) (1999) ("'There is

nothing unlawful in the government's appropriation of abandoned property,

which does not constitute a search or seizure in the legal sense.' . . . However,

if unlawful police conduct coerces the defendant into abandoning the property,

then suppression of the evidence may be warranted." (citation omitted)). Thus,

the marijuana could not be the basis for a legal arrest. See Jones v. State, 126

Ga. App. 841, 845 (192 SE2d 171) (1972) (explaining that the fruits of an illegal

search cannot be used as the basis of an arrest). The search of Appellant done

incident to that illegal arrest was therefore tainted, and the money found in his

pocket during that search should have been suppressed. See State v. Alexander,

245 Ga. App. 666, 668 (538 SE2d 550) (2000) ("Fruits of an unlawful arrest

may not be introduced into evidence."); OCGA § 17-5-30 (a).

(c)     Although the trial court erred in not suppressing evidence of

the money found in Appellant's pocket, he is not entitled to a new trial, because

it is clear that the error was harmless.

> "Before a federal constitutional error can be held harmless, the
> court must be able to declare a belief that it was harmless beyond a
> reasonable doubt. Reversal is required where there is 'a reasonable

12

possibility' that the improperly admitted evidence contributed to the verdict."

Bryant v. State, 288 Ga. 876, 898 (708 SE2d 362) (2011) (citations omitted). See also Ramirez v. State, 279 Ga. 569, 574-575 (619 SE2d 668) (2005) (applying this harmless-error test to a violation of the Fourth Amendment).

At trial, there was no dispute that Appellant and three associates traveled to the victim's house in Macon, that Appellant went inside the house, and that he came out with cash. There was evidence from three witnesses that after the visit, Appellant had a substantial amount of cash, and two of them testified that Appellant gave them several $100 bills; there was also evidence that another of Appellant's co-indictees had $1,800 in $100 bills four days later. The evidence that should have been excluded – the $1,817 in cash found on Appellant at his school five days after the visit to Macon – was cumulative of the other evidence that he had obtained a large amount of money.

Furthermore, at trial, Appellant did not quibble about *how much* money he got from his godfather; his defense was that whatever money he obtained from Wilkins was not a product of a robbery, but rather a birthday present. Neither Appellant nor the State argued that the *amount* of money he got proved

13

*how* he got the money – as a gift or at gunpoint. Because there was no dispute (and ample evidence) that Appellant got a substantial amount of cash from the victim, and the exact amount he got was immaterial, the trial court's error in admitting additional evidence about the money was harmless beyond a reasonable doubt. See Ramirez, 279 Ga. at 574-575 (concluding that a seizure assumed to be unlawful was harmless because identification cards in the seized wallet served only to identify the defendant and identity was not an issue at trial).

3.  Finally, Appellant contends that his trial counsel provided ineffective assistance by failing to call Milton Brooks to testify at trial, claiming that Brooks would have convincingly testified that he saw a woman he did not know driving the victim's vehicle on the day after Appellant came to the victim's house. To prevail on this claim, Appellant must show both that his trial counsel provided deficient performance and that, but for the deficiency, there is a reasonable probability that the outcome of the proceeding would have been different. See Strickland v. Washington, 466 U.S. 668, 687, 694 (104 SCt 2052, 80 LEd2d 674) (1984). Appellant has not met this heavy burden.

In his opening statement at trial, Appellant's counsel apparently referred

14

to Brooks, saying:

> Now, there is evidence in the State's records, if they present it or not, I don't know, but a neighbor saw someone driving Mr. Wilkins' truck on a Sunday. Supposedly, he was dead on a Saturday, and the person allegedly driving that truck is not Mr. Wingate or anybody that you will hear from in this trial.

At the motion for new trial hearing, trial counsel recalled that in discovery there was "some mention of someone seeing a vehicle that belonged to the victim" being driven by someone else, but he did not recall contacting Brooks and could not remember if he subpoenaed him. Trial counsel further testified that he expected Brooks might appear for the State, but he also said that he did not attempt to hire an investigator to find Brooks. Counsel said that he was focused on preparing to cross-examine Appellant's co-indictees at the time, and his failing to secure Brooks's testimony was an "oversight."

At the motion for new trial hearing, Brooks testified that he and Wilkins lived within a half-mile of each other and would chat whenever they saw each other, and he knew the vehicles Wilkins owned. Brooks claimed that on his way to the track on January 24, 2010, the day after Appellant visited Wilkins, he saw a woman he did not know driving one of Wilkins's vehicles on the street where Wilkins lived. On direct examination, Brooks first testified that he was not sure

15

if he saw the unknown woman driving the Land Cruiser or Tundra, then said that he "thought it was the Tundra," and then said that "[i]t was definitely one of [Wilkins's] vehicles." On cross-examination, Brooks testified that the woman was definitely driving either Wilkins's Tundra or "one identical to it." The evidence at trial showed that the morning after Brooks claimed to have seen the unknown woman driving the victim's Tundra, the police found that truck parked in the victim's driveway, neatly draped with a cloth cover. Brooks described the woman as having long hair and a hat, and said that when he saw her, she "looked over and turned her head back," as if she did not want him to see her face. Brooks explained that he could not describe the woman further because he "didn't really pay any attention."

Brooks also testified that he never spoke to law enforcement about the case and never gave a statement about seeing Wilkins's vehicle being driven by an unknown woman. At trial, however, the State had advised the court that a police officer who would not be testifying had spoken to Brooks, and Appellant's trial counsel testified at the motion for new trial hearing that he remembered information provided by the State in discovery mentioning Brooks's statement about seeing someone in Wilkins's vehicle. Indeed,

16

Appellant's ineffective assistance claim rests on the allegation that his trial counsel knew about Brooks's statement to the police before trial but failed to pursue that information.

Trial counsel's failure to try to locate Brooks to investigate his statement and potentially to present his testimony at trial may have been deficient performance, but it did not prejudice Appellant, because there is no reasonable probability that Brooks's testimony would have changed the outcome of the trial. Brooks's admission that he was not really paying attention to the incident, his equivocation as to which vehicle he saw and whether it was actually Wilkins's or just the same kind as Wilkins's, and his apparently false testimony that he never spoke to the police indicate that even if trial counsel had located Brooks and made the risky decision to have him testify at trial, his testimony would have been inconsistent and unpersuasive and would not in reasonable probability have led to a different outcome. Thus, Appellant's ineffective assistance of counsel claim fails. See Kidd v. State, 292 Ga. 259, 261-262 (736 SE2d 377) (2013).

Judgment affirmed. All the Justices concur.