**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**September 30, 2022**

# In the Court of Appeals of Georgia

A22A1146. FLUKER v. STATE.

MERCIER, Judge.

Following a jury trial, Quincy Jamar Fluker was convicted of family violence simple battery, aggravated battery, and possession of a firearm during commission of a crime.[1] Fluker filed a motion for new trial, which the trial court denied in part. Thereafter, Fluker filed this appeal, claiming that he received ineffective assistance of counsel and that the trial court erred in response to a jury question. For the following reasons, we affirm.

---

[1] He was found not guilty of family violence aggravated assault and aggravated assault, and another count of aggravated assault merged with aggravated battery. While Fluker was also found guilty of home invasion and burglary, the trial court granted part of Fluker's motion for new trial, finding the evidence insufficient for home invasion and burglary. The State does not appeal the partial grant of Fluker's motion for new trial.

Viewed in the light most favorable to the verdict, the evidence presented at trial showed the following. See *Wingate v. State*, 296 Ga. 21, 22 (1) (a) (764 SE2d 833) (2014). In August of 2019, Michael Hines lived with her adult children (Nius Morton and Journey Morton) in a house that she owned, and she rented the bottom floor of her house to Darrius Martin. Hines and Fluker were previously married for approximately five months, but they divorced in 2014.

On August 28, 2019, Hines woke up in Martin's room to a phone call from Fluker, who had come to the house to move a refrigerator. Scared of Fluker's possible reaction to discovering her in Martin's room, Hines "stayed quiet."[2] Hines testified that Fluker "always carries a gun," and she had told this to Martin. "After a couple [of] hours," Hines left Martin's room and went out a side door and attempted to sneak upstairs to get dressed and go to work. However, Fluker saw Hines in the kitchen and began yelling at her for being in Martin's room. Hines ran out of the house, but Fluker followed her and began hitting her.

---

[2] In 2017, Hines applied to obtain protective orders against Fluker, but she failed to "show up for court."

A neighbor observed the interaction between Fluker and Hines outside the house and saw Fluker scream at Hines (who was crying at the time), press her up against the wall, and then pull her back into the house. The neighbor called 911.

Hines told Fluker to leave, but Fluker ignored her and went to Martin's room. Fluker banged on Martin's bedroom door and yelled that Martin needed to "get his stuff and leave." Feeling that both he and Hines were in danger, Martin came out of his room with an assault rifle in his hand and said that he was not going to leave because he lived there. Hines stood between Martin and Fluker and tried to defuse the escalating situation. Fluker flashed the gun he had in the waistband of his pants and asked Martin, "what are you doing in the room with my wife." Martin denied that Hines had been in his room and told Fluker that he was going back into his room, and with his gun still down, he turned to walk back to his room. As Martin turned to leave, Fluker shot Martin. Martin fell to the ground and dropped his gun, which Fluker threw out of Martin's reach. Fluker stood over Martin, threatened to kill him, and fired the gun a second time. When Hines heard the second shot, she "took off." Martin testified that he was hit by the second bullet. Martin and Hines both testified that Martin never threatened Fluker, never pointed his weapon at him or fired his gun. Martin suffered a gunshot wound to the stomach, which caused him to lose his spleen,

part of his large intestine, and part of his liver, and he had to be hospitalized for three weeks as a result of the injuries.

During the lunch break on the second day of trial, Fluker approached Martin and told him that Martin "was lucky to be alive."

Fluker took the stand and testified that after he had moved the refrigerator he saw Hines and she appeared to be scared. They stepped outside and Hines told him that Martin would not let her leave his room. Fluker claimed that Hines "got . . . kind of aggressive with her . . . language" and that she "lunged at" him, but he denied shoving her. Fluker testified that when he went downstairs with Hines, he asked Martin to leave but Martin responded by saying he was a "gangster" Fluker tried to calm Martin, but Martin "stepped back . . . to raise the gun at [him]" so Fluker "just shot" Martin. Fluker claimed he shot Martin "because [he] feared for [his] life" and thought Martin "was going to shoot [him]." Fluker then picked up Martin's gun, moved it away, and told Martin that they were going to get him some help, but he claimed he did not have his cell phone with him so he was unable to call 911. However, he claimed that he asked someone else to call 911.

Despite testifying multiple times during the State's case-in-chief that Martin had not threatened Fluker, Hines asserted when called as a defense witness that she

4

"remembered" that Martin "said that he was gangster and that he would leave [Fluker] stanking." Hines admitted that she went to Fluker's house after her initial testimony so that she could apologize to Fluker.

1. Fluker argues that he received ineffective assistance because his counsel failed to secure the testimony of Martin's surgeon that Martin was struck by only one bullet. To prevail on a claim of ineffective assistance of counsel, Fluker "must show both that his trial counsel provided deficient performance and that, but for the deficiency, there is a reasonable probability that the outcome of the proceeding would have been different." *Wingate*, supra at 28 (3); see also *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). While the test imposed under *Strickland* is not impossible to meet, Fluker's burden is a heavy one. See *Wingate*, supra.

At the hearing for Fluker's motion for new trial, Martin's treating surgeon, Dr. Paul Brock, testified that Martin was only shot once, but that the bullet broke into pieces which led to "multiple exit wounds." Brock testified that he had not previously spoken with any attorneys, for either the defense or State, related to the case. At the hearing, Fluker's trial counsel testified that he should have investigated whether Martin suffered a second bullet injury.

5

Fluker argues that his trial counsel's failure to call Brock as a witness prejudiced him because Brock's testimony would have given more credence to his self defense claim. However, the undisputed evidence at trial showed that Fluker shot Martin, and both Martin and Hines testified that, after shooting Martin, Fluker stood over Martin and fired a second bullet. While Hines recanted some of her testimony when she was recalled as a witness for Fluker, she never recanted her assertion that Fluker stood over Martin, after he had already been shot, and fired a second bullet.

Had Brock testified at trial, his testimony would not have revealed whether Fluker fired a second bullet. Instead, Brock would have testified only that a second bullet did not hit Martin. Further, even without Brock's testimony, the jury heard that there was a question as to whether the second bullet struck Martin. While Martin testified at trial that he was hit by two bullets, a Rome Police Department investigator testified that Martin initially reported that he was only shot once. Fluker's counsel highlighted these conflicting statements in his closing argument, by stating that Martin "changed his story in many significant ways like . . . completely forgetting to tell the police at the hospital that . . . Fluker [stood] over him and [said], I'm going to kill you, and then shoot[] him again." Had Brock testified at trial that Martin had only been hit by one bullet, Brock's testimony would have been cumulative of the

6

investigator's testimony. See *Cummings v. State*, 306 Ga. App. 368, 371 (2) (b) (702 SE2d 691) (2010) ("counsel's alleged failure to introduce cumulative evidence . . . was not reasonably likely to have changed the outcome of the trial and did not amount to ineffective assistance."). Therefore, setting aside whether Fluker's counsel was deficient, the trial court was authorized to find that Fluker failed to show that he was prejudiced by his counsel's failure to call Brock as a witness. See *Wingate*, supra (regardless of whether defendant's trial counsel was deficient for failing to call a witness at trial, there was no reasonable probability it would have led to a different outcome at trial so defendant's claim for ineffective assistance of trial counsel failed).

2. Fluker argues that the trial court erred in its response to a jury question. During deliberations, the jury sent a note to the judge asking: "Self defense doesn't apply to the aggressor. Is this true[?]" The trial court asked how the parties thought he should respond, and counsel for both sides agreed that the trial court should recharge on the issue. The trial court had previously sent all of the charged jury instructions out with the jury, and in response to the question the trial court wrote back: "The charge of the court given to you orally and in writing contains all of the instructions the court may give you regarding self-defense or justification. Please read sections 3.00.00, 3.01.10, 3.10.10, 3.10.12, 3.10.13, 3.16.20, 3.16.30." The

7

highlighted jury charges referred to instructions on affirmative defenses, justification, reasonable beliefs, retreat, excessive force, and revenge for a prior wrong. The section describing mistake of fact was not specifically listed. Fluker did not object to the trial court's response to the jury question. As such, we review the response only for plain error. See *Rainwater v. State*, 300 Ga. 800, 805 (4) (797 SE2d 889) (2017).

> Plain error requires a clear or obvious legal error or defect not affirmatively waived by the appellant that must have affected the appellant's substantial rights, i.e., it affected the outcome of the trial-court proceedings. Stated more succinctly, the proper inquiry is whether the instruction was erroneous, whether it was obviously so, and whether it likely affected the outcome of the proceedings. If the failure to give an instruction is shown to constitute such an error, the appellate court may remedy the error by exercising its discretion if the error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Rainwater*, supra at 802 (2) (citation and punctuation omitted).

Fluker argues that the mistake of fact jury charge should have been specifically referred to in the trial court's response to the jury's question, because he claimed that he was under the mistaken belief that his ex-wife had been previously held against her will by Martin, and thus he was justified in ordering Martin to leave the house and to

act in self defense. Setting aside whether the mistaken belief jury charge was initially warranted,[3] the trial court gave a jury charge on mistake of fact during its charge of court. Furthermore, while not highlighted specifically, the mistake of fact jury charge was contained in the written jury charges that the jurors were given in the deliberation room. "The court's recharge, taken as a whole, and considering the court's initial charge on these principles which contained no omissions and which the jury had with it during deliberations, did not constitute plain error requiring reversal." See *Rainwater*, supra at 806 (4). As such, this claim fails.

*Judgment affirmed. Dillard, P. J., and Markle, J., concur.*

---

[3] See OCGA § 16-3-5 ("A person shall not be found guilty of a crime if the act or omission to act constituting the crime was induced by a misapprehension of fact which, if true, would have justified the act or omission."); *Taylor v. State*, 272 Ga, 744, 746 (1) (534 SE2d 67) (2000).