# Illinois Official Reports

## Appellate Court

---

**People v. Qurash, 2017 IL App (1st) 143412**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RAMSEY QURASH, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-3412 |
| Filed | March 16, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-2533; the Hon. Catherine M. Haberkorn, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Bradley D. Jarka, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Jon Walters, and Michael Vojta, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Justice McBride concurred in the judgment and opinion.<br>Presiding Justice Ellis dissented, with opinion. |

**OPINION**

¶ 1     A two-count criminal information charged defendant, Ramsey Qurash, with (1) possession of a controlled substance (diazepam) and (2) possession of cannabis after having previously been convicted of possession of a controlled substance. The Cook County trial judge found defendant guilty of possession of a controlled substance (less than 200 grams of diazepam) and possession of cannabis (10 to 30 grams) and sentenced him to concurrent prison terms of three years. On appeal, defendant contends that (1) the trial court erred in denying his motion to suppress because the officer's statement of "come here" to defendant was a seizure and (2) the court erred in failing to hold a fitness hearing. For the reasons stated below, we affirm.

¶ 2                          I. BACKGROUND

¶ 3     In March 2014, prior to trial and at defense counsel's behest, the trial court ordered a behavioral clinical examination (BCX) of defendant's fitness to stand trial, with and without medication. The court agreed with counsel that a BCX was "a good idea" in light of "defendant's behavior in the courtroom." Defendant balked at counsel's request, reiterating his objection during an April proceeding. In April 2014, psychologist Dr. Erick Neu of the court's forensic clinical services (FCS) reported that he examined defendant that month and opined that he was fit to stand trial. Dr. Neu found that defendant was "not suffering from a mental condition that would compromise his ability to understand the nature of the proceedings against him or to assist in his defense."

¶ 4     In May 2014, psychiatrist Dr. Aarti Mehta of FCS reported that she examined defendant that month and found him fit to stand trial with medications. According to Mehta, defendant expressed understanding of the charges and the nature of the proceedings against him and was capable of assisting in his defense "if he chooses." However, she reported, he "would need to continue his present medications in order to maintain his fitness."[1]

¶ 5     After the trial court had received both BCX reports, defendant complained that the BCXs had delayed his case and he wanted to represent himself. The court told defendant that it had ordered the BCXs to determine his fitness to stand trial, noting his "outbursts" of speaking out-of-turn. The court ascertained from defendant that he took his medication that day. The court ordered FCS to provide copies of Dr. Mehta's psychiatric summary and Dr. Neu's psychological summary to the State and defense. In June 2014, the court and parties acknowledged receiving the summaries. Defense counsel filed his answer and requested a July 2014 trial date, which the court set.

¶ 6     At trial, Chicago police officers Stephen Gregory and Kimberly Oppedisano testified that they were on patrol in an unmarked police car at about 7:30 p.m. on January 9, 2014. As Officer Gregory drove slowly northbound on the 1600 block of North Tripp Avenue, both officers saw defendant walking toward them southbound on a sidewalk along the west side of the street. Officer Gregory recognized defendant from the neighborhood. When the officers

_____

[1]At that time, defendant was taking 150 milligrams of Sertraline daily for depression, 10 milligrams of buspirone three times a day for anxiety, and 50 milligrams of the anticholinergic medication diphenhydramine daily. There was no indication that defendant was suffering adverse side effects from his medications that would impair his fitness.

were about 15 feet away from defendant, Officer Gregory stopped the police car, lowered his window, and said to defendant, "come here."

¶ 7     As Officer Gregory called him, defendant dropped a large white bottle into the snow on the parkway. He did not make any other furtive movements, nor did he try to flee. When he saw defendant drop the object, Officer Gregory stopped the car, got out, and walked over to where defendant dropped the bottle. Officer Gregory picked up the bottle, noting there was nothing on the ground nearby nor was there another person nearby. The white bottle had no label and contained 26 bags of a green leafy material Officer Gregory suspected to be cannabis. At this point, Officer Gregory told Officer Oppedisano to arrest defendant. While searching defendant, Officer Oppedisano found in his pants pocket two more bottles, one with no label and the other with a torn-off label. Officer Oppedisano found no prescription for the substances. One bottle contained 10 yellow pills and yellow pill fragments, and the other had 9 white pills and white pill fragments.[2]

¶ 8     Defendant testified that he was walking to the store when a police car passed by slowly. Defendant recognized the officers from the neighborhood. The male officer lowered the car window and said "come here" to defendant. The assistant State's Attorney asked defendant, "[t]he male officer asked you to come over to their car, right?", to which defendant replied, "[y]ep." The State again asked defendant, "when they asked you to come over to their car, you said, 'all right, sure', and walked right up?" Defendant replied, "I did. I walked right up. But I didn't have nothing in my hand when I walked up." According to defendant, as he walked to the car, Officer Gregory walked past him toward the sidewalk. Officer Gregory did not stop to talk to defendant as he walked past.

¶ 9     Following defendant's testimony, defense counsel made an oral motion to quash arrest and suppress evidence, to be taken with the case.[3] The trial court allowed counsel to make the oral motion but ultimately denied it.

¶ 10    Following arguments on the trial evidence, the trial court found defendant guilty of both possession of cannabis and possession of a controlled substance (diazepam). The court stated that the testimony of Officers Gregory and Oppedisano was clear and partially corroborated by defendant. The court found the fact that Officer Gregory saw defendant drop the bottle and then saw no other person in the area or objects on the ground nearby before recovering the bottle proved that defendant possessed the bottle and its contents. Moreover, the court noted, defendant admitted he possessed the bottles found in his pants pocket.

¶ 11    Defendant filed a motion for a new trial, challenging the sufficiency of the trial evidence but not the absence of a fitness motion, and a motion to reconsider the denial of his motion to quash arrest. He argued that the officers searched him without consent or probable cause. The trial court denied the motions, reiterating its finding that the officers' testimony was credible. The court then sentenced defendant to concurrent three-year prison terms.

¶ 12    This appeal followed.

---

[2]The parties stipulated to forensic testing showing that the 26 bags of plant material contained 11.2 grams of cannabis and the 10 yellow pills and fragments contained 1.9 grams of diazepam.

[3]Defendant surprised his counsel by testifying, and as a result, counsel had not filed a motion to quash arrest and suppress evidence.

¶ 13                                II. ANALYSIS

¶ 14      On appeal, defendant argues (1) the trial court erred in denying his motion to suppress because the officer's statement of "come here" to defendant was a seizure and (2) the court erred in failing to hold a fitness hearing. We address defendant's arguments in turn.

¶ 15              A. Does the Statement "Come Here," Uttered by a Police Officer
                           to a Citizen, Result in a Seizure?

¶ 16      Defendant first challenges the trial court's denial of his motion to quash arrest and suppress statements. Defendant contends that the court erred in denying his motion to quash because he was seized at the moment Officer Gregory said, "come here." According to defendant, the officers lacked a reasonable suspicion or probable cause for this seizure. Therefore, defendant claims, the drugs that he dropped to the ground as well as those recovered from his person should have been suppressed.

¶ 17      The question presented is deceptively simple: as a matter of law, do the words "come here," uttered by a police officer to a citizen, result in a seizure? The trial court, after listening to both the officers and defendant testify, found that defendant's encounter with the officers was consensual and did not implicate defendant's constitutional rights. Because we conclude that the determination of whether the statement "come here" is a request or command is a question of fact and because we conclude the trial court's finding in this regard was not against the manifest weight of the evidence, we find no reason to disturb the trial court's denial of defendant's motion to quash arrest and suppress evidence.

¶ 18      Police-citizen encounters are divided into three tiers: arrests, which must be supported by probable cause; brief investigatory detentions or *Terry* stops, which must be supported by reasonable and articulable suspicion of criminal activity; and consensual encounters that involve no coercion or detention and thus do not implicate constitutional rights. *People v. Almond*, 2015 IL 113817, ¶¶ 52, 56; *People v. Williams*, 2016 IL App (1st) 132615, ¶ 34.

¶ 19      A person is seized when his freedom of movement is restrained by physical force or a show of authority. *Almond*, 2015 IL 113817, ¶ 57. The test is whether a reasonable person would conclude, in light of the totality of the circumstances, that he was not free to leave. *Id.* Following the United States Supreme Court's decision in *United States v. Mendenhall*, 446 U.S. 544, 553 (1980) (opinion of Stewart, J., joined by Rehnquist, J.), the Illinois Supreme Court adopted the *Mendenhall* plurality factors indicating a seizure when the person does not attempt to leave: (1) the threatening presence of several officers, (2) the display of a weapon by an officer, (3) the physical touching of the person, and (4) the use of language or tone of voice compelling the person to comply with the officer's requests. *Almond*, 2015 IL 113817, ¶ 57. The absence of any of these factors is not dispositive but highly instructive on the issue of whether a seizure occurred. *Id.*

¶ 20      When reviewing the trial court's ruling on a motion to quash arrest and suppress evidence, reviewing courts apply a two-part standard of review. *Id.* ¶ 55. Findings of fact are given "great deference" and can be reversed only if they are against the manifest weight of the evidence. *Id.* A trial court's finding is against the manifest weight of the evidence only if it is unreasonable, arbitrary, and not based on the evidence presented, or if the opposite conclusion is clearly evident. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008).

- 4 -

¶ 21    The trial court's ultimate legal ruling on whether the evidence should be suppressed is reviewed *de novo*. *Almond*, 2015 IL 113817, ¶ 55. At a hearing on a motion to quash, the trial court is responsible for determining witness credibility, weighing the evidence, and drawing reasonable inferences therefrom. *Williams*, 2016 IL App (1st) 132615, ¶ 32.

¶ 22    Here, it is undisputed that Officers Gregory and Oppedisano did not exit their car, display any weapons, or physically touch defendant prior to stating, "come here." Thus, the only *Mendenhall* factor that is in play is the use of language or tone of voice compelling the person to comply. See *Almond*, 2015 IL 113817, ¶ 57 (setting forth the *Mendenhall* factors). Defense counsel conceded in oral argument before this court that the determination of whether the statement "come here" is a request or a command is a question of fact. Accordingly, the question before us is whether the trial court was manifestly erroneous in determining that the words "come here" were issued as a request. See *id.* ¶ 55 ("[w]e afford great deference to the trial court's findings of fact and will reverse those factual findings only if they are against the manifest weight of the evidence"). In other words, to reverse a trial court's finding as against the manifest weight of the evidence, this court must find that the trial court's finding was unreasonable, arbitrary, and not based on the evidence presented, or the opposite conclusion was clearly evident. See *Deleon*, 227 Ill. 2d at 332.

¶ 23    The trial court, after listening to both the officers and defendant testify, made a finding of fact that Officer Gregory's statement, "come here," was a request. Specifically, in ruling on the motion to quash, the court found Officer Gregory testified "clearly and credibly and convincingly." The court found that Officer Gregory rolled down his window and "*asked* the defendant to come over." The court stated, "[t]he defendant corroborates that in his own testimony by saying he did see the officers, they *asked* him to come over to the car. So the defendant doesn't deny. In fact, they did just *ask* him. They didn't—they didn't demand that he come here. They didn't pull out any weapons. They were in the car, *asked* him to come over to the car." (Emphases added.) The court further stated, "in fact police officers do have the right to *ask* any citizen to come over and talk to them about anything they wish. Citizen[s] can refuse if they want. They don't have to cooperate. They do have the right to *ask* him. In this case Mr. Qurash did in fact go over by the officers." (Emphases added.) The court also stated as follows: "I do believe based on both the officers' testimony and corroborated in part by the defendant's testimony, that there were grounds to—[it] was legal for them to *ask* the defendant to come over and talk to them." (Emphasis added.) The trial court then denied the motion to quash.

¶ 24    In *Almond*, the defendant challenged the credibility of the officer's account of his encounter with the defendant. *Almond*, 2015 IL 113817, ¶ 63. The defendant and the officer presented completely different versions of their interaction. *Id.* The trial court resolved the credibility issue in favor of the officer's account, finding that his testimony was clear and credible. *Id.* The supreme court recognized the discrepancy in the defendant's and officer's testimonies but stated that nothing in the record suggested that the "trial court's assessment was against the manifest weight of the evidence or should" be disturbed on review. *Id.*

¶ 25    Similarly, here, nothing in the record suggests the trial court's finding that the words "come here" were issued as a request was against the manifest weight of the evidence. Officer Gregory's tone of voice when he told defendant to "come here" is not possible to discern from this record. No one testified to Officer Gregory's tone when he said, "come here"; accordingly, this court, or for that matter any reviewing court, cannot determine his tone when he spoke to defendant. That determination is solely within the province of the trier of fact, who heard the

witnesses testify. It is not the function of the appellate court to reevaluate the evidence that was presented to the trial court and substitute our judgment for that of the trial court because we think a different tone may have been used. The exact same words can convey a myriad of different meanings based upon the tone used.

¶ 26 Likewise, we do not consider the phrase "come here" to be unambiguously or *per se* compulsory in nature. An officer calling a person over to the officer does not by itself necessarily constitute a seizure. See *People v. Tilden*, 70 Ill. App. 3d 859, 863 (1979) (a uniformed officer's request to the defendant to approach and produce identification did not constitute a *Terry* stop where the officer did not draw a weapon and the record revealed no further evidence that the "defendant's freedom to walk away was in any fashion overcome by force or threat of force"). Language can have completely different meanings depending on how it is expressed. It is for this reason that the Illinois Supreme Court combined language and tone together in analyzing whether a seizure occurred in *Almond*. See *Almond*, 2015 IL 113817, ¶ 58.

¶ 27 Listening to the language and tone used by all participants to the interaction and then deciding what was meant by the statement, what the speaker intended, and what the listener gleaned from the statement are functions of the trial court. We cannot take two words in isolation and make our own conclusions about what meaning was imparted. By doing so, without the benefit of hearing the witnesses testify to how Officer Gregory said "come here" and without the benefit of seeing how the witnesses testified to the effect Officer Gregory's statement had, we would be completely disregarding the function and role of the trial court. See *People v. Richardson*, 234 Ill. 2d 233, 251 (2009) (recognizing the deferential standard of review for findings of fact and credibility determinations is "grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony"). Trial courts are required to listen to all of the evidence and make findings of fact based on what they have heard, including whether "come here" was meant and received as a request. Here, the court determined the words "come here" were a request, and there is nothing in the record suggesting that determination was against the manifest weight of the evidence. See *Almond*, 2015 IL 113817, ¶ 55 ("[w]e afford great deference to the trial court's findings of fact and will reverse those factual findings only if they are against the manifest weight of the evidence").

¶ 28 In support of his claim that the trial court erred, defendant points to the First District decision in *Williams*, where we found that "the officers restrained defendant's liberty by a show of authority as soon as they arrived on the scene, and thus, defendant was immediately seized." *Williams*, 2016 IL App (1st) 132615, ¶ 41. In *Williams*, the officer testified that the defendant was not free to leave, and the defendant testified that he did not feel free to leave. *Id.* ¶ 40. Also, while the *Williams* defendant testified that the officers were in a police car when they said "come here," one of the officers testified that he had exited his vehicle before addressing the defendant, and the *Williams* court expressly considered that exit as evidence of a seizure. *Id.* ¶¶ 6, 11, 39. Both the officer and the defendant agreed in *Williams* that the defendant was not free to leave. *Id.* ¶ 40; see also *People v. Billingslea*, 292 Ill. App. 3d 1026, 1030 (1997) ("We believe [the officer's] action in *stepping to block defendant* while telling him to 'come here' was a show of force indicating [the officer's] intent to restrain defendant." (Emphasis added.)). Accordingly, *Williams* is distinguishable. There was no conflict in

*Williams* for the trial court to resolve, as the issue of whether defendant was seized was not up for determination. Both sides agreed and testified that he was seized.

¶ 29    The dissent concludes, without ever discussing the testimony at the hearing or the trial judge's findings, that defendant was seized immediately when the officer uttered the words "come here." The dissent is not "prepared to hold that a seizure occurs every single time the words 'come here' are a part of a conversation between a citizen and a police officer." The dissent says it does not need to do so to decide this case, but that is essentially what it has done. It has declared that "come here" is an order; it is not question, it is not a request. Not only is such a conclusion contrary to the trial judge's findings, but it makes no sense since the dissent has not explained what else made this a seizure other than to say a reasonable person walking alone on the streets in a high-crime area would not feel free to leave.

¶ 30    Even though the dissent disclaims that it is not concluding the words "come here" will always amount to a command or order and thus a seizure, the dissent has nonetheless effectively concluded the words "come here" are, in fact, always an order. Even the dissent does not suggest the officer's tone of voice was compelling, just that the words were compelling. Here, the officers did not approach defendant; instead Officer Gregory asked defendant to "come here," meaning near the car in which the officer was seated. The fact that a person knows that a police officer is a police officer when conversing has never been suggested as a factor that courts consider as particularly significant at all. *People v. Ocampo*, 377 Ill. App. 3d 150, 159 (2007). If it were, most conversations between a citizen walking alone and an officer would become seizures.

¶ 31    The dissent misunderstands the reasonable person standard. Our supreme court has explained the reasonable person standard is when, taking into account all the circumstances surrounding the incident, "the conduct of the police would lead a reasonable innocent person under identical circumstances to believe that he or she was not free to decline the officers' requests or otherwise terminate the encounter [citation], that person is seized." (Internal quotation marks omitted.) *People v. Gherna*, 203 Ill. 2d 165, 178 (2003).

¶ 32    The dissent cites a series of cases for the proposition that a police officer's words, including the words "stop" or "come here," may be sufficient to effectuate a seizure. However, there is not a single case cited by the dissent in which a court concluded that an encounter in which a police officer, while seated in a car, rolled down a car window to speak to a citizen and stated "come here," without anything more, amounted to a seizure in violation of that citizen's fourth amendment rights. Our research has not disclosed such a case. Further, in each case relied upon by the dissent, the trial court, upon reviewing a motion to suppress, considered all of the circumstances surrounding the encounter, all of the testimony presented at the hearing, the appropriate standard of review, and case precedent to decide whether a seizure occurred.

¶ 33    Among the many cases cited by the dissent is the case of *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶ 20, wherein this court found that there was a seizure based upon the officers pulling alongside the defendant and ordering him to stop walking and additionally telling him to take his hands out of his pockets. The direction to the defendant to stop, coupled with the additional command directing him to remove his hands from his pockets, was clearly a seizure. In *People v. Dall*, 207 Ill. App. 3d 508, 521-22 (1991), the reviewing court found that a seizure occurred when the defendant was running and an officer yelled at him and ordered him to stop. The word "stop" is clearly a command when uttered by a police officer to a fleeing suspect because it is unambiguously compulsory. If the trial court had found that the word "stop" was not an

order, clearly that finding would be manifestly erroneous, as the opposite conclusion is clearly evident. However, the opposite conclusion is not clearly evident in the case at bar.

¶ 34 The dissent looks to other jurisdictions in order to find support for the position that defendant was seized. The dissent cites cases from the United States Court of Appeals for the Second Circuit as well as Kentucky, Arkansas, Massachusetts, Texas, and the District of Columbia. The dissent also cites an unpublished decision from California. However, we need not, nor should we, consider foreign courts' determinations when there is substantial case law in our own state to answer the question presented, including *Almond*, a binding Illinois Supreme Court decision. See *People v. Applewhite*, 2016 IL App (1st) 142330, ¶ 23 (decisions of foreign courts are not binding on Illinois courts, and we are required to follow our own supreme court precedent). Further, the cases cited by the dissent are all distinguishable. In *United States v. Simmons*, 560 F.3d 98, 105-06 (2d Cir. 2009), the appellate court *agreed* with the lower court's finding as to when the defendant was seized. Moreover, in *Simmons* and several of the other cases cited by the dissent, additional facts were present that warranted a finding that the defendant was "seized." See *id.* (officers entered a building and twice ordered the defendant to stop while standing between the defendant and the doorway); *Jefferson v. State*, 76 S.W.3d 850, 853 (Ark. 2002) (officers turned on their headlights as the defendant passed in front of their car, and one officer stepped out of the patrol car and called to the defendant to come to the car twice); *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010) (officer shone his car's overhead lights in the defendant's direction and issued a "request-that-sounded-like-an-order, to 'come over here and talk to me' ").

¶ 35 Two of the cases cited by the dissent actually support, rather than refute, our decision. In *Commonwealth v. Barros*, 755 N.E.2d 740, 742-43 (Mass. 2001), the appellate court found an officer's initial statement to the defendant, in which he stated "Hey you … I want to speak with you," was not a seizure where the officer remained in his car and did not impede or restrict the defendant's freedom of movement. *Id.* It was only the second request, wherein the officer exited his police cruiser, walked up to the defendant after the defendant had "rebuffed" him, pointed at the defendant in the presence of two other officers, and said, "Hey you. I wanna talk to you. Come here," that constituted a seizure. (Emphasis omitted.) *Id.* at 745. In *In re D.T.B.*, 726 A.2d 1233, 1234-36 (D.C. 1999), the appellate court concluded a seizure occurred where an officer, while standing near a building's only exit, twice ordered the defendant to "come here." In reaching its conclusion, the appellate court found "of particular relevance" the trial court's finding that the officer's "statement was 'undoubtably [*sic*] stern' and probably amounted to a command." *Id.* at 1236. Thus, the court in *In re D.T.B.* gave weight to the trial court's finding as to the tone of voice that was used by the officer when ordering the defendant to "come here."

¶ 36 Finally, the dissent adopts the reasoning set forth in the Kentucky Supreme Court case of *Strange v. Commonwealth*, 269 S.W.3d 847 (Ky. 2008), a case the dissent characterizes as having a "similar fact pattern." The facts are readily distinguishable. There was no issue in that case as to whether the words spoken by a police officer to a citizen were the equivalent of a command or order. In *Strange*, the officer testified that he and another officer separated the defendant from another individual and "moved" the defendant from a van to the officer's nearby police cruiser. *Id.* at 849. The *Strange* court rejected the argument that the officers "merely asked" defendant to walk away from the van, stating the testimony revealed otherwise and it was "clear that the trial court recognized" a seizure occurred when the officer directed

the defendant to move over to the police cruiser. *Id.* at 850. The *Strange* court explained that the officer's assertion that " 'we separated them' " and that he " 'moved [the defendant]' away from the van established beyond dispute that he took control of [the defendant] and expected compliance." *Id.* at 850-51.

¶ 37     The dissent asserts that the application of the facts to the law in this case will somehow result in people ignoring officers' commands and being criminally prosecuted for doing so. What the majority has found in this case is that the trial court, rather than the appellate court, is charged with making a finding of fact on the language and tone an officer used in making a determination of whether a seizure has occurred. The suggestion that now people are going to be prosecuted for ignoring commands is simply a red herring.

¶ 38     The dissent believes that the appellate court's role is to somehow, "send a message." It is not. The appellate court's role is to apply the facts to the law and make a determination on whether the trial court's decision complied with the law. A court is not free "to ignore an entire body of relevant case law and the principles and guidelines articulated therein." *People v. Luedemann*, 222 Ill. 2d 530, 552 (2006). The only "message" that is appropriate for the appellate court to send is that we will apply the law to the facts and not diminish the necessity for trials or even a trial court. To suggest that we need to "guide" people on how to comport themselves seems to suggest a fundamental misunderstanding of what the role of the appellate court is.

¶ 39     The trial court has made, and by definition of its role was required to make, the finding regarding what the intention, tone, and impact of the words "come here" had. The trial court did this by listening to the witnesses, watching how they testified, and based upon that, judging their demeanor and credibility. To suggest that the court's finding was manifestly erroneous without any contrary information oversteps the boundaries of appellate review. Based on the foregoing, the trial court did not err by denying defendant's motion to quash arrest and suppress evidence.

¶ 40             B. Did the Trial Court Err by Failing to Conduct a Fitness Hearing?

¶ 41     Defendant also contends that the court erred in failing to hold a fitness hearing when it expressed *bona fide* doubt as to defendant's fitness. He acknowledges that he did not preserve the issue of his fitness but correctly notes that under the plain error doctrine, we may review unpreserved error where a clear or obvious error occurred and (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Hood*, 2016 IL 118581, ¶ 18. Our first step is to determine whether error occurred. *People v. Jones*, 2016 IL 119391, ¶ 10.

¶ 42     A defendant is presumed to be fit to stand trial and is unfit to stand trial "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2014). Because fitness concerns only the ability to function in the context of a trial, a person may be fit for trial though his mind may be otherwise unsound. *People v. Garcia*, 2015 IL App (1st) 131180, ¶ 52. For example, a defendant receiving psychotropic medication will not be presumed unfit solely on that basis. 725 ILCS 5/104-21(a) (West 2014). The issue of a defendant's fitness to stand trial may be raised by the court, defense, or State at any time before, during, or after trial, and

"[w]hen a bona fide doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further," including ordering a BCX by a psychologist or psychiatrist. 725 ILCS 5/104-11(a), (b), 104-13(a) (West 2014). There are no fixed or immutable signs that invariably indicate the need for further inquiry into a defendant's fitness. *People v. Hanson*, 212 Ill. 2d 212, 222 (2004). The factors that may create a *bona fide* doubt of a defendant's fitness include any irrational behavior, his demeanor at trial, any prior medical opinion on the defendant's competence, and any representations by defense counsel on the defendant's competence. *People v. Bryant*, 2016 IL App (5th) 140334, ¶ 32; *Garcia*, 2015 IL App (1st) 131180, ¶ 52.

¶ 43    When a *bona fide* doubt concerning a defendant's fitness to stand trial exists, the trial court shall order a fitness hearing to determine the defendant's fitness. 725 ILCS 5/104-16(a) (West 2014); *Garcia*, 2015 IL App (1st) 131180, ¶ 51. However, ordering a BCX does not constitute the trial court's finding of *bona fide* doubt. *Hanson*, 212 Ill. 2d at 222; *Garcia*, 2015 IL App (1st) 131180, ¶ 51. The trial court's determination on fitness will not be reversed unless it was against the manifest weight of the evidence. *Bryant*, 2016 IL App (5th) 140334, ¶ 32.

¶ 44    Two separate doctors performed BCXs in this case. In his psychological summary, Dr. Neu found defendant to be "alert and fully oriented" and to be speaking in a manner "organized, coherent, and to task with no indication of a thought disorder, delusions, *** paranoia, or prominent cognitive dysfunction." Dr. Neu found defendant had a full range of affect and showed no signs of clinical depression, nor did he display "any hostile or aggressive behavior." When asked about various aspects of courtroom procedure and personnel, defendant answered accurately but cynically. Dr. Neu observed that defendant showed awareness of the charges against him and the sentencing he faced, he was able to coherently give his account of the alleged offenses, and he stated a willingness to cooperate with counsel.

¶ 45    In her psychiatric summary, Dr. Mehta reported that defendant cooperated with her evaluation, giving logical and coherent answers to her questions. Defendant admitted to psychiatric treatment including prescriptions for sertraline, Xanax, and clonazepam.[4] Turning to his fitness, Dr. Mehta ascertained from defendant that he knew the charge against him and its seriousness, knew the roles of the courtroom personnel, and stated that he had "not had any problems working with" defense counsel. Defendant properly described trial, jury trial, plea bargains, oaths, witnesses, and evidence. Dr. Mehta concluded that if defendant chose, he "should be fully capable of assisting counsel in his defense." Defendant was cooperative and maintained eye contact throughout the evaluation; properly stated the date, time, and place; engaged in mathematical and focus-testing exercises; and "showed an ability to think abstractly and showed good short term memory." His affect was "appropriately reactive," he had "normal speech rate, rhythm, and volume," his "thought process was organized and goal directed," and he was able to pay attention and concentrate. Dr. Mehta indicated that defendant showed no symptoms of anxiety, depression, mania, or psychosis, and he expressed no delusions, paranoia, or perceptual abnormalities.

¶ 46    In June 2014, the trial court and parties acknowledged receiving the summaries. Defense counsel filed his answer and requested a July 2014 trial date, and the court set a July trial date.

¶ 47    Here, as a threshold matter, we do not find that the trial court's reference to defendant's courtroom behavior before ordering a BCX or its reference to his "outbursts" of speaking

---

[4]Dr. Mehta explained that the latter two treat anxiety.

out-of-turn while ordering copies of the evaluation summaries constituted a finding of *bona fide* doubt as defendant contends. If ordering a BCX is not a finding of *bona fide* doubt, we see no reason to conclude that merely ordering copies of the summaries underlying the BCX reports constitutes such a finding. Both ordering a BCX and ordering a copy of an evaluation summary are the court's efforts to gather information from which it can reach a conclusion regarding fitness, not an expression of its conclusion.

¶ 48 We consider it decisive that the trial court acknowledged its receipt of the evaluation summaries in the same proceeding in which it set trial for the following month. The court thus implicitly found no *bona fide* doubt of defendant's fitness for that trial. Notably, defense counsel, following submission of the summaries, requested a relatively imminent trial rather than requesting a fitness hearing or otherwise expressing doubt of defendant's fitness to understand trial or cooperate with counsel. The detailed summaries by psychiatrist Dr. Mehta and psychologist Dr. Neu show they found no signs of unfitness, much less unfitness arising from mental illness, when they evaluated him in April and May 2014. Defendant's July 2014 trial testimony, where he gave coherent and responsive answers to questions from both his counsel and the State, amply supports the conclusion that there was no *bona fide* doubt of his fitness. In sum, we see no error in the absence of a fitness hearing.

¶ 49                                III. CONCLUSION

¶ 50 For the reasons stated, we affirm the trial court's judgment.

¶ 51 Affirmed.

¶ 52 PRESIDING JUSTICE ELLIS, dissenting.

¶ 53 If you were walking alone down a street at night in a high-crime neighborhood and two police officers, driving in the opposite direction, stopped their car, rolled down their window, and said, "Come here," would you, as a reasonable person, feel free to leave—to disregard that request and keep walking? The majority says yes, a reasonable person in that situation would feel free to ignore the request to "come here" and walk away from the police officers.

¶ 54 I respectfully disagree. A reasonable, innocent person, standing in defendant's shoes here, upon hearing a police officer say "Come here" to him, would believe that he was required to do just that. A holding to the contrary is an unrealistic reflection of how a reasonable person objectively views a police officer's authority.

¶ 55 My colleagues in the majority surely can cite case law that supports their position—probably more case law than I could cite to support mine. But neither the Illinois nor the United States Supreme Court has decided this particular question; no decision from either court compels a result here. And no matter how many cases lead the majority to its conclusion, I simply cannot understand how an officer saying "Come here" to someone under these facts could be viewed as anything other than an officer issuing a command. Nor do I understand why fourth amendment jurisprudence would require *more* than those words—a physical confrontation, a more hostile or aggressive approach toward the citizen—before finding a seizure. I think requiring more than those words is unrealistic and promotes the wrong public policy.

¶ 56       I would hold that a seizure occurred when Officer Gregory said "Come here" to defendant, and because that seizure was unsupported by a reasonable suspicion, the seizure was unreasonable.

¶ 57                                                                    I

¶ 58       The standard for determining when police have seized someone is well established in this context: "[A] person is seized within the meaning of the fourth amendment 'only when, by means of physical force or a show of authority, his freedom of movement is restrained.' " *People v. Almond*, 2015 IL 113817, ¶ 57 (quoting *United States v. Mendenhall*, 446 U.S. 544, 553 (1980) (plurality opinion)). "In other words, a person has been seized when, considering the totality of the circumstances, a reasonable person would believe he is not free to leave." *Id.*; see also *People v. Luedemann*, 222 Ill. 2d 530, 550 (2006) (when individual is "walking down a street" when confronted by officer, appropriate question is whether reasonable person would believe he is not free to leave).

¶ 59       As the majority correctly notes, the United States Supreme Court has provided four examples of circumstances in which a reasonable person would not feel free to leave in the face of a police encounter: (1) the threatening presence of several officers, (2) the display of a weapon, (3) physical touching of the person by the officers, and (4) using language or tone of voice compelling the individual to comply with the officer's request. Here, we have one of those four examples—language compelling the individual to comply with the officer's request. The officer stopped his car and said "Come here" to the only person walking on the street at that time, defendant. And though the officers were in plainclothes, it is undisputed that the officers and defendant recognized each other; defendant knew they were police officers, and the officers knew he knew.

¶ 60       I do not see how, in this context, those two words could be viewed as optional. I am not prepared to hold that a seizure occurs every single time the words "come here" are a part of a conversation between a citizen and a police officer. Nor is it necessary to do so to decide this case. But under the facts of this case, when defendant was walking alone at night in a high-crime neighborhood, when two police officers stopped their car and focused their attention exclusively on defendant, and when the *only* two words used were "come here," I do not see how a reasonable person would view those two words as optional. "Come here" is not a question. "Come here" is not a request. "Come here" is an order.

¶ 61       It is well settled that officers may approach an individual and put questions to that person without necessarily "seizing" that individual in the constitutional sense; courts will not find a seizure in that context "so long as the officers do not convey by their words or actions to the person being questioned that compliance with their requests is required" or "convey a message, by means of physical force or show of authority, that induces the individual to cooperate." *People v. Gherna*, 203 Ill. 2d 165, 179 (2003).

¶ 62       So if an officer approached an individual walking on the sidewalk and asked that individual a question, typically no seizure would be found because the officer has done nothing to specifically indicate that the individual cannot keep walking. But if the officer said, "Stop," "Freeze," or "Don't move," a seizure likely has occurred, because the individual is being told in no uncertain terms that he cannot continue moving forward. See, *e.g.*, *People v. Dall*, 207 Ill. App. 3d 508, 521-22 (1991) (where defendant was running down street and officer told defendant to stop, seizure occurred at moment officer told him to stop).

¶ 63        Under the circumstances present here, the words "come here" are not meaningfully different than "stop" or "freeze." If an officer tells a man to "stop," that officer is communicating that the individual is not free to continue moving in the direction in which he was headed and instead must stand still. If, as here, the officer, from a northbound car, tells a man walking southbound on the sidewalk to "come here," he is doing the same thing—he is communicating that the individual is not free to continue walking southbound and instead must change direction, cross over a snowy parkway, and walk into the street to speak with the officer. Arguably, the order to "come here," in this context, is a greater intrusion on liberty than if the officers had merely told defendant to "stop," but I do not see how it could be viewed as *less* intrusive. This, presumably, is why the United States Supreme Court made note of the difference between an officer approaching a person to ask questions as opposed to summoning that individual to the officer's position. See *Mendenhall*, 446 U.S. at 555 (opinion of Stewart, J., joined by Rehnquist, J.) (in finding no seizure had occurred, noting that federal agents "did not summon the respondent to their presence, but instead approached her and identified themselves as federal agents").

¶ 64        This court and other courts have held that a police officer's words—including the words "stop" or "come here"—may be sufficient to effectuate a seizure. See, *e.g.*, *People v. Williams*, 2016 IL App (1st) 132615, ¶ 39 (defendant seized when officer pulled up in car behind defendant, got out, and told defendant " 'to come here to where [he] was at' "); *In re Rafeal E.*, 2014 IL App (1st) 133027, ¶ 20 (where officers pulled squad car alongside defendant on foot, officer left vehicle and directed defendant to "stop" and to put his hands in the air, defendant was seized); *Dall*, 207 Ill. App. 3d at 521-22 (where defendant was running down street and officer told defendant to stop, seizure occurred at moment officer told him to stop); *Strange v. Commonwealth*, 269 S.W.3d 847, 851 (Ky. 2008) (seizure found where defendant "was directed to move over to the police cruiser," and his "passive compliance *** cannot convert that order into a request"); *United States v. Simmons*, 560 F.3d 98, 105-06 (2d Cir. 2009) ("A police officer's order to stop constitutes a seizure if a reasonable person would have believed that he was not free to leave, [citation], and the person complies with the officer's order to stop ***." (Internal quotation marks omitted.)); *Jefferson v. State*, 76 S.W.3d 850, 855 (Ark. 2002) (seizure found where officer "issu[ed] a command that [defendant] stop and come to them"); *Commonwealth v. Barros*, 755 N.E.2d 740, 745 (Mass. 2001) (seizure where police officer "pursued [defendant] and told him, 'Come here' "); *In re D.T.B.*, 726 A.2d 1233, 1236 (D.C. 1999) (seizure where officer, standing near Laundromat's only exit, twice said "come here" to defendant in "an undoubtedly stern voice"); *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010) (seizure where officer shined light at defendant and made "request-that-sounded-like-an-order, to 'come over here and talk to me' "); *In re Martin H.*, No. B151148, 2002 WL 1732650, at *3 (Cal. App. July 25, 2002) (seizure found where officer pulled up patrol car, shone headlights on defendant, and partner left vehicle and said " 'Come here,' or words to that effect," to defendant).

¶ 65        The majority relies almost exclusively on the fact that the officer's use of the phrase "come here" was couched as a request—that the officer " '*asked* *** defendant to come over' " (emphasis in original) (*supra* ¶ 23)—rather than a command. I respectfully disagree.

¶ 66        It is true that Gregory said that he asked defendant to "come here" and did not testify that he demanded that defendant approach the car. But the only time that Gregory said he "asked" defendant was in his description of the conversation during the State's direct examination:

- 13 -

"Q. What, if anything, did you do when you observed the defendant walking in your direction?

A. I observed the defendant walking. I then stopped my car, asked him to come here."

Cross-examination was the one and only time that Officer Gregory more specifically clarified the words he used, when he quoted himself:

"Q. You called out to [defendant]?

A. Called him by his name?

Q. Did you call out to him?

A. I said, 'Yes, come here.' If that is what you are asking. I didn't call him by his name."

And defendant testified that the officers "looked at [him] and said, 'Come here,' " corroborating Gregory's testimony on cross-examination.

Thus, while Gregory initially described the encounter by saying that that he "asked" defendant to come here, it is notable that when he broke down the exact words he used—when he quoted himself—those words were, " '[C]ome here.' " Just as notably, though defendant also described his interaction with the officers more than one time, on the one occasion he actually quoted the officer, that quote was the same as Gregory's—that Gregory said, " 'Come here.' "

I do not see how the trial court's characterization of Gregory's words as a "request" should take precedence over the actual words that Gregory used. No matter how much deference we afford to the trial court's finding that Gregory "asked" defendant to approach, both parties to the communication testified that Gregory only used two words: "Come here."

Those two words, alone, are not a request. Nor could they plausibly be construed as a question ("Come here?"). To a man walking down the street, alone at night, in a high-crime neighborhood, when two officers stopped their car in the middle of the street and one of them said, "come here," any reasonable person would believe that he was required to comply with that directive—that he was not free to leave.

II

Our fourth amendment rulings have policy implications. Though the objective free-to-leave test is "necessarily imprecise" and flexible enough to cover a wide range of police-citizen encounters, it is designed to "allow[ ] the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment." *Michigan v. Chesternut*, 486 U.S. 567, 573-74 (1988). And the United States Supreme Court has also recognized that fourth amendment jurisprudence should be crafted with an eye to the *citizen's* behavior, encouraging compliance with police directives to avoid an escalation of tension during police-citizen encounters. In *California v. Hodari D.*, 499 U.S. 621, 627 (1991), the Court declined to find that an individual who fled in response to a police request had been seized. That holding was in part animated by the Court's desire to encourage individuals to submit to police orders, reasoning that if those who fled from police retained their fourth amendment protections, they would have no incentive *not* to flee:

"Street pursuits always place the public at some risk, and *compliance with police orders to stop should therefore be encouraged*. Only a few of those orders, we must

- 14 -

presume, will be without adequate basis, and *since the addressee has no ready means of identifying the deficient ones it almost invariably is the responsible course to comply.*" (Emphases added.) *Id.*

¶ 74 When we hold that the words "come here" to a citizen are not enough to induce a reasonable citizen to comply, whether we intend it or not, we are signaling to police officers that if they truly want compliance in that situation, they will have to do more than a polite "come here"—whether that be something less polite or significantly more aggressive, none of which the law should encourage.

¶ 75 As for citizens, I fear that the majority's holding will have the unintended effect of encouraging individuals *not* to comply with a police officer's request, or order, to "come here." Under the majority's reasoning, the best way for citizens to protect their fourth amendment rights is to ignore the police in that context—because if they complied even though not required to do so, they would be consenting to police questioning without any fourth amendment protections at all. See *People v. Thomas*, 198 Ill. 2d 103, 111 (2001) ("[I]f there was no seizure, then the fourth amendment was not implicated ***."). If a citizen is not sure whether a police officer's request to "come here" is an optional request or an order, the citizen is incentivized to presume the former and keep walking, lest that citizen waive the protection of the fourth amendment.

¶ 76 But even that course of action puts the reasonable person in a trick box. As the Court in *Hodari D.* noted, the reasonable person "has no ready means of identifying" which communications from the police must be complied with and which are optional. *Hodari D.*, 499 U.S. at 627. What if the police officer repeats the request to "come here?" What if the officer raises his voice the second time or gets out of the car or shines his flashlight? At what point does a reasonable, innocent person recognize that he or she is no longer free to leave?

¶ 77 The reason these questions matter is the flip side of this coin—at some point refusing to comply with a police officer's communication can turn into a crime. See 720 ILCS 5/31-1(a) (West 2014) ("A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer *** of any authorized act within his or her official capacity commits a Class A misdemeanor."); *People v. Synnott*, 349 Ill. App. 3d 223, 227, 229 (2004) (defendant was guilty of obstructing police officer when he "repeatedly disobeyed the arresting officer's order to exit the vehicle," as "merely refusing a police officer's lawful order to move can constitute interference with the officer in the discharge of his or her duty").

¶ 78 I am not suggesting that defendant, in this case, would have been guilty of a crime had he refused to respond to Officer's Gregory communication to "come here." My point is that these lines are fuzzy. If we hold that the words "come here" did not constitute a seizure—that defendant should have felt free to ignore them—reasonable, innocent people are left with very little guidance as how to comport themselves. Immediately yielding to the officer's communication, under the majority's holding, would be a "consensual" choice to speak with the officer, and any fourth amendment rights are waived. Refusing to comply—that is, continuing to walk southbound on the sidewalk—would preserve the reasonable person's fourth amendment rights, but at some risk, because at some point in time, if the officer persists, the reasonable person will be guilty of a crime if he does not comply.

¶ 79 Neither police officers nor citizens should be subjected to such guesswork, nor should there be any incentive on either side's part to escalate the encounter. As the Kentucky Supreme Court noted in a similar fact pattern:

- 15 -

"A reasonable person, in a high crime neighborhood late in the evening, would not and should not reasonably feel free to resist a police officer's order to move. Citizens are encouraged to comply with reasonable police directives, and the police should be permitted to expect reasonable compliance with reasonable demands. Appellant was directed to move over to the police cruiser, and he apparently did so promptly and peacefully. His passive compliance with the policeman's order cannot convert that order into a request which Appellant, or any citizen, should feel free to resist." *Strange*, 269 S.W.3d at 851.

¶ 80    It would be much simpler and safer, and most importantly of all, a more realistic appraisal of how the ordinary citizen responds to police officers, to hold that if a police officer tells you to "come here," you do it—you are not free to leave. That is a lesson that most of us were taught as children and what we teach our children. It is, in my view, what the reasonable, innocent person would believe in most contexts, if not every context—and certainly in the context presented here. To put the same advice in more legal terminology: Do what an officer tells you to do, and you will not waive the protection of the fourth amendment in doing so.

¶ 81                                                    III

¶ 82    Finding that the words "come here," in this context, constitute a seizure would not unduly restrict a police officer's behavior. A "seizure" does not connote police misconduct. The constitution only forbids *unreasonable* seizures. *Gherna*, 203 Ill. 2d at 181 ("only those seizures which are 'unreasonable' violate the fourth amendment"). Many seizures are perfectly reasonable.

¶ 83    Outside of the investigatory context, where the police are exercising their "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute" (*Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)), the police may reasonably seize an individual without having any suspicion of wrongdoing. See *People v. McDonough*, 239 Ill. 2d 260, 272 (2010) (to justify seizure under community-caretaking exception, police "must be performing some function other than the investigation of a crime," and the "seizure must be reasonable because it was undertaken to protect the safety of the general public"). The very point of the "community caretaking" doctrine is to "uphold searches or seizures as reasonable under the fourth amendment when police are performing some function other than investigating the violation of a criminal statute." *Id.* at 269. So if a police officer said "come here" to an individual for the purpose of "helping children find their parents, mediating noise disputes, responding to calls about missing persons or sick neighbors, or helping inebriates find their way home" (*id.*), even if a court determined that a seizure occurred, it would be a perfectly reasonable, and therefore constitutional, seizure.

¶ 84    But in the investigatory context, it is—and should be—a different matter. In an investigatory context, like this case, the police must have some suspicion that the individual seized is involved in some kind of wrongdoing. See *People v. Ray*, 327 Ill. App. 3d 904, 911 (2002) ("[A] search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing."). There is nothing unjustified about holding that, when an officer says "come here" to an individual for an investigatory purpose, the full protection of the fourth amendment—that the officer have some reasonable suspicion of criminal wrongdoing—protects that individual.

- 16 -

IV

Having found that no seizure occurred, the majority had no occasion to consider whether the seizure lacked a reasonable, articulable suspicion. I would do so and hold that the seizure violated the fourth amendment.

The State makes no attempt to argue that the officers had reasonable suspicion to stop defendant, nor do I see any. See *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (police may conduct investigatory stop if they have reasonable, articulable suspicion that suspect was involved in criminal activity). The only reason given for the stop was that defendant was in a high-crime neighborhood, which is insufficient to justify an investigatory stop. See *People v. Surles*, 2011 IL App (1st) 100068, ¶ 39 ("This court has *** rejected the argument that *** a defendant's presence in a 'high-crime area' is a legally sufficient basis for performing a *Terry* stop and frisk."); *People v. Harris*, 2011 IL App (1st) 103382, ¶ 14 ("A conclusory and unsubstantiated statement that a location is a 'high crime area' is insufficient to establish that consideration for purposes of justifying a *Terry* stop."). Consequently, I would conclude that the officers' seizure was unlawful.

Finally, I would conclude that the fruits of the illegal seizure—the narcotics that defendant dropped—should be suppressed. Contrary to the State's argument, defendant did not abandon the marijuana by dropping it to the ground. See *People v. Henderson*, 2013 IL 114040, ¶ 44 (where, during course of seizure, defendant flees and drops contraband, causal chain between illegal seizure and recovery of contraband was broken, and evidence need not be suppressed).

Rather, defendant discarded the marijuana in response to the illegal seizure—which was effected when defendant complied with the officers' order—and the fruits of that seizure should have been suppressed. See *People v. Wilson*, 141 Ill. App. 3d 156, 159 (1986) ("If the police [seizure] was improper, the State may not rely upon the defendant's dropping the bag to justify the subsequent seizure and search of the bag."); *United States v. Wilson*, 953 F.2d 116, 127 (4th Cir. 1991) (suppression required where defendant abandoned coat containing drugs "*after* he had been illegally seized" and abandonment "was clearly the direct result of the illegal seizure" (emphasis in original)); *Jones v. State*, 28 A.3d 1046, 1055 (Del. 2011) ("[S]uppression is required if the abandonment [of contraband] was a direct consequence of the illegal seizure."); *Wingate v. State*, 764 S.E.2d 833, 838 (Ga. 2014) ("Because [defendant] was unlawfully detained at the time he apparently discarded the marijuana, the marijuana was the product of an unlawful seizure.").

I would reverse the trial court's denial of defendant's motion to quash arrest and suppress evidence and reverse defendant's conviction outright.