2016 IL App (1st) 132615

FIFTH DIVISION
AUGUST 19, 2016

No. 1-13-2615

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 C6 61474 |
| | ) | |
| RONNIE WILLIAMS, | ) | Honorable |
| | ) | Anna Helen Demacopoulos, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Lampkin concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant Ronnie Williams was convicted of possession of a controlled substance with intent to deliver and sentenced to three years' probation. On appeal, defendant contends that the trial court erred when it denied his motion to quash arrest and suppress evidence because the police illegally seized him immediately when they arrived on the scene, despite a complete lack of reasonable suspicion that he was engaged in criminal activity. Defendant also contends that the State failed to prove him guilty beyond a reasonable doubt and that a portion of the police officer's testimony at trial was improperly admitted.

¶ 2     We find that the testimony shows that defendant was seized by police without reasonable suspicion, and thus, the trial court erred when it denied defendant's motion to quash arrest and

suppress evidence. Accordingly, we reverse the trial court's ruling on that motion, thereby suppressing the recovered narcotics, and reverse defendant's conviction.

¶ 3                                  BACKGROUND

¶ 4                              I. Pretrial Proceedings

¶ 5     Defendant was charged with possession of a controlled substance with intent to deliver and possession of a controlled substance for possessing between 1 and 15 grams of a substance containing cocaine. Prior to trial, defendant filed a motion to suppress evidence alleging that the white powdery substance was illegally seized because the search and seizure were conducted without a warrant, police lacked probable cause for the search, and he did not consent to the search. Defendant also filed a separate motion to quash arrest and suppress evidence arguing that he was illegally seized because the police lacked reasonable suspicion that he was engaged in criminal activity and his detention and arrest were conducted without a warrant, probable cause, or consent.

¶ 6     At a hearing on the two motions, defendant testified that at 6:48 p.m. on November 29, 2011, he drove to East 13th Place in Ford Heights to visit his cousin, Terry Evans. Evans' son, Terry Evans, Jr., also lived at that residence. Defendant testified that he parked the vehicle he was driving directly in front of Evans' house and exited the vehicle. As defendant walked on the sidewalk towards the door of Evans' home, he observed an unmarked police vehicle drive around the corner. The two officers inside that vehicle asked defendant to "come here," and he complied and walked 10 feet to their location. Defendant testified that he did not feel free to leave when he was commanded to "come here."

¶ 7     Defendant further testified that the officers then exited their vehicle and asked him what he was doing there, and he replied that he was picking up his cousin, Terry Evans. The officers

2

placed defendant against the vehicle, and while one officer stayed with him, the second officer went to the door of his cousin's house to talk with his cousin. Five minutes later, that officer returned to the vehicle, searched defendant, and recovered $1300 from his pocket. Defendant testified that he did not give the officers consent to search him and he did not feel free to leave at that time either. The officers next asked defendant if they could search his vehicle, and he said no. The officers then removed defendant's vehicle keys from his pocket, unlocked his vehicle door, searched the vehicle for half an hour, but did not remove any items from the vehicle. Thereafter, the officers called for a drug-sniffing dog and the dog searched the vehicle.

¶ 8 Defendant acknowledged that the vehicle he was driving belonged to his wife and that he was authorized to drive the vehicle to that location. Defendant testified that from the time he initially arrived at the location to the time he was taken to the police station was about an hour and a half. He also testified that there was no outstanding warrant for his arrest, and he was not committing any acts that violated the law.

¶ 9 On cross-examination, defendant denied that he was parked in front of the house next door and denied that the police drove past and looked at him while he was sitting inside the vehicle. However, defendant then acknowledged that he observed the police officers before he exited the vehicle and that he exited the vehicle as they drove by. He further acknowledged that when the officers asked him to stop, they were inside their vehicle, did not have their red and blue lights activated, and did not point a gun or flashlight at him. When the officer went to the door of the home, Evans came to the door and spoke with the officer for 5 or 10 minutes, and when that officer returned to the street, he told the other officer what Evans said, but defendant did not hear that conversation. Defendant testified that he was picking up Evans to take him to Wal-Mart. Defendant then denied that the officers asked if they could search him and denied that

3

they asked if they could search his vehicle. He estimated that 30 minutes passed from the time the officers entered his vehicle to the time the dog arrived at the scene, and while the dog searched the vehicle, an officer asked defendant if he wanted to sit inside the squad vehicle, and he did. Defendant testified that it was raining and windy at the time. Defendant also acknowledged that he was not handcuffed until after the dog searched his vehicle.

¶ 10    Cook County sheriff's police investigator Gena testified that about 6 p.m. on November 29, 2011, he was driving westbound on 13th Place when he passed defendant, who was sitting in a vehicle parked in front of an abandoned house. The officer made eye contact with defendant, who looked back at him. Looking in his rearview mirror, Investigator Gena observed defendant exiting his vehicle, and the officer turned his vehicle around and pulled up behind defendant's vehicle. Investigator Gena acknowledged that defendant was not committing a crime at that time and that there was no outstanding warrant for his arrest.

¶ 11    Defendant began walking eastbound, and Investigator Gena exited his vehicle and said "[p]olice, can I talk to you?" Gena testified that the reason he stopped defendant was to conduct a field interview. The officer then walked to where defendant's vehicle was parked. Defense counsel asked "did you tell him to come here to where you were at," and Investigator Gena replied "[y]es."

¶ 12    When defendant returned to where Investigator Gena was standing, Gena asked him what he was doing at that location. Investigator Gena acknowledged that defendant was not committing a crime at that moment. Defense counsel asked the investigator if defendant was "free to leave" at that point, and Investigator Gena replied "[a]t that moment, no." When asked why, Investigator Gena testified that it was because defendant was parked in front of an abandoned building in a high-crime narcotics area and the officer wanted to verify what he was

4

doing there. Investigator Gena had previously executed search warrants and made numerous narcotics arrests on that block.

¶ 13    Investigator Gena further testified that defendant told him that his cousin, Terry Evans, lived next door and he was going to Evans' house. While Gena remained by the vehicle with defendant, Investigator Klomes went to the door of the house, spoke with Evans for two minutes, then returned to the vehicle. Gena again acknowledged that defendant was not free to leave while they were verifying his story. Evans told Investigator Klomes that defendant was not his cousin and that he did not know why defendant was there, which contradicted what defendant told the officers. Investigator Gena testified that at that point, he was trying to determine whether defendant was committing a crime. A K-9 unit that was part of their team was on the scene while they conducted the stop, and two back up officers, investigators Smith and McNamara, also arrived.

¶ 14    Investigator Gena testified that he asked defendant if he could search him, and defendant said "yes." During that search, Gena recovered $1300 and two cell phones from defendant's pocket. Investigator Gena again acknowledged that defendant was not free to leave at that point because he was still speaking with him. The officer then asked defendant if he could search his vehicle, and defendant said "yes." The officers initially directed the dog to sniff the interior of the vehicle, and after the dog alerted the officers, they searched his vehicle. Prior to the dog sniff and subsequent police search, defendant stood outside for about five minutes, and Investigator Smith later had defendant sit in the backseat of his vehicle. After narcotics were recovered from the vehicle, Investigator Smith had defendant exit the vehicle and handcuffed him. Investigator Gena estimated that the entire encounter, from the time he drove past defendant until the time he was handcuffed, lasted five or six minutes.

¶ 15    The trial court noted that defendant testified that Investigator Gena told him to "come here" and asked him "what are you doing here." The court found that Investigator Gena's words were requests, not directives or commands, and according to defendant's own testimony, he voluntarily went to the officer and engaged in a consensual conversation. The court noted that the officers then investigated defendant's claim that he was there to visit Evans and discovered that Evans had no idea why defendant was there. The court found that this revelation "in and of itself" gave the officers sufficient information to continue their investigation of defendant in light of their knowledge and experience in making several narcotics arrests on that particular street.

¶ 16    The court pointed out that defendant initially testified on direct examination that the officers asked him if they could search his vehicle, but then denied that fact on cross-examination, thereby putting his credibility at issue and rendering Investigator Gena's testimony from that point forward to be more credible. The court found that defendant then consented to being personally searched, which revealed $1300 and two cell phones, and, consequently, gave the officers more information to conduct further investigation. The court also found that Gena's testimony that defendant consented to the search of the vehicle was credible. The trial court further found that once the dog made a positive indication that narcotics were in the vehicle, the police had probable cause to search that vehicle and, after finding the narcotics, had probable cause to arrest defendant. The court also pointed out that defendant agreed that he was not "under arrest" until after the dog searched the vehicle.

¶ 17    The trial court concluded that defendant consented to his encounter with the police, and even if he did not, federal and state case law clearly establishes that a police officer may approach and question a person without implicating the fourth amendment. The court found that defendant never testified that the officers made a show of authority other than their inquiry as to

why he was on that street. Based on its finding, the trial court denied defendant's motions to quash arrest and suppress evidence.

¶ 18                                II. Trial

¶ 19    At trial, Investigator Gena testified that between 6 and 7 p.m. on November 29, 2011, he was working as part of a five-member team of officers patrolling Ford Heights. Investigator Gena and his partner, Investigator Klomes, drove down the 1500 block of 13th Place, which is known as a high-crime narcotics block where the officer had previously executed search warrants and made numerous narcotics arrests. As they drove westbound down the block, Investigator Gena observed defendant sitting in a white Chevrolet Cavalier, parked facing east in front of a boarded-up abandoned house. As the officers drove past, Investigator Gena made eye contact with defendant, then turned his vehicle around and pulled up behind defendant's vehicle. Defendant then exited his vehicle and walked eastbound on 13th Place, and Investigator Gena exited his vehicle, announced his office, and asked to speak with defendant. Defendant stopped, and investigators Gena and Klomes approached him as investigators Smith and McNamara arrived at the scene in their vehicle.

¶ 20    Investigator Gena asked defendant what he was doing in front of the abandoned house. Defendant replied that he was visiting his cousin, Terry Evans, who lived next door, and that they were going out that night. Investigator Gena continued speaking with defendant while Investigator Klomes went to the house next door and spoke with the resident there. Investigator Klomes then returned to the street and informed Gena about his conversation with the person next door.

¶ 21    Investigator Gena asked defendant if he had anything on him, and defendant replied that he had some money and agreed that Gena could search him. Investigator Gena recovered $1360

and two cell phones from defendant. Defendant then gave the officers permission to search his vehicle. Investigator Ramos arrived at the scene with a drug-sniffing dog, and when the dog searched the vehicle, it indicated that something was in the center console area. Investigator Klomes then searched that area and recovered a clear plastic bag that contained 13 smaller plastic bags that each contained an off-white rock-like substance that Gena suspected was narcotics. Defendant was then handcuffed and placed under arrest.

¶ 22 At the police station, Investigator Gena inventoried the suspect narcotics in accordance with police procedures and placed the items in a safe for analysis by the crime laboratory. He also inventoried the two cell phones and $1360 recovered from defendant, which consisted of 25 $1 bills, 5 $5 bills, 4 $10 bills, 41 $20 bills, 3 $50 bills, and 3 $100 bills.

¶ 23 On cross-examination, Investigator Gena acknowledged that defendant was lawfully parked on 13th Place, that he did not know how long defendant had been parked there, and that he had not observed defendant committing a crime when he asked to speak with him. Investigator Gena further acknowledged that he had referred to the vehicle defendant was sitting in as defendant's vehicle, but that defendant was not the registered owner of that vehicle and that an insurance card found in the center console area did not contain defendant's name. He also acknowledged that the evidence recovered from the vehicle was hidden inside the vehicle and that he never observed defendant in actual possession of that evidence. In addition, Investigator Gena testified that he weighed the recovered items with their packaging at the police station and the total weight was 3.3 grams.

¶ 24 On redirect examination, Investigator Gena testified that when he ran the license plate of the vehicle defendant was in, he learned that defendant's wife was the owner of the vehicle. He

also testified that defendant's wife's name was on the insurance card that was inside the vehicle, but he could not recall her name.

¶ 25    Investigator William Klomes testified substantially the same as Investigator Gena regarding their observation of defendant sitting alone in the parked vehicle in front of the abandoned house, defendant's exit of the vehicle, and their approach and request to speak with him. To verify defendant's explanation for his presence, Investigator Klomes went to the door of the house defendant pointed out, spoke with a person there, then returned to the street and informed Investigator Gena about the conversation. Investigator Klomes also testified similar to Investigator Gena regarding defendant's consent to a pat-down search, during which money was recovered, and his consent to a search of his vehicle. The canine unit arrived on the scene, and the dog sniffed the vehicle and made a positive indication in the center console area. Investigator Klomes then searched that area of the vehicle, discovered a loose piece of trim, and underneath that piece found suspect narcotics. Investigator Klomes recovered a plastic bag that contained several smaller pink plastic bags that he then gave to Investigator Gena. On cross-examination, Investigator Klomes testified that he did not know how long defendant had been parked in front of the abandoned house, but they had observed him sitting there for at least a couple of minutes as they drove down the block.

¶ 26    Maureen Bommarito, a forensic chemist with the Illinois State Police crime laboratory, testified that she tested 7 of the 13 recovered items and found them positive for 1.144 grams of cocaine. The total weight of all of the items was 2.612 grams, and the estimated weight of the six items she did not test was 0.9 gram.

¶ 27    Terry Evans testified for the defense that he lives on East 13th Place in Ford Heights with his wife and children, including his 23-year-old son, Terry Evans, Jr. Defendant is married to

Evans' cousin, and Evans has known him for a year or two. Evans does not allow anyone to park in his driveway so that he can pull straight in when he comes home from work. On November 29, 2011, Evans was supposed to leave work at 6 p.m., but worked an extra hour because a coworker was late. Evans and defendant had planned to meet at Evans' house and then to go to Wal-Mart so defendant could buy a 50-inch television. Evans arrived home at 7:50 p.m. and asked his son if defendant had come to the house. Evans never observed defendant that day, nor did he speak with any police officers at his home. Evans testified that he knew nothing about the drugs that were recovered from the vehicle defendant was in.

¶ 28    Following one hour of deliberations, the jury found defendant guilty of possession of a controlled substance with intent to deliver and possession of a controlled substance. The trial court subsequently sentenced defendant to 3 years' probation and 10 days of service in the Sheriff's Work Alternative Program.

¶ 29                                    ANALYSIS

¶ 30    On appeal, defendant first contends that the trial court erred when it denied his motion to quash arrest and suppress evidence because the police lacked reasonable suspicion to seize him. Defendant argues that he was not engaged in any criminal activity or suspicious behavior, but that the officers seized him as soon as they arrived on the scene. Defendant asserts that the trial court's findings are uncontested; however, the court erred in applying the law to the facts. He further argues that the court erroneously found that the encounter between him and the police was consensual where both he and Investigator Gena testified that he was not free to walk away from the officers, and, thus, was seized.

¶ 31 The State responds that the motion was properly denied because defendant's conversation with police was entirely consensual, the officers had reasonable suspicion that he was engaged in criminal activity, and defendant consented to the search of his person and his vehicle. The State asserts that because defendant concedes that the facts are uncontested, we must accept the trial court's factual findings, including its finding that defendant voluntarily engaged in a consensual conversation with the officers and was not seized when they arrived on the scene.

¶ 32 Our review of the trial court's ruling on defendant's motion to quash arrest and suppress evidence presents questions of both fact and law. *People v. McCarty*, 223 Ill. 2d 109, 148 (2006). The trial court's factual findings are given great deference and will not be disturbed on review unless they are against the manifest weight of the evidence; however, the court's ruling on the motion is a question of law which we review *de novo*. *People v. Close*, 238 Ill. 2d 497, 504 (2010). At a hearing on a motion to quash and suppress evidence, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, and drawing reasonable inferences therefrom. *People v. Ballard*, 206 Ill. 2d 151, 162 (2002).

¶ 33                                  I. Seizure

¶ 34 The fourth amendment of the United States Constitution, which applies to the states through the fourteenth amendment, protects all citizens from unreasonable searches and seizures in their homes, effects, and persons. U.S. Const., amend. IV. Encounters between police and citizens have been divided by the courts into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, commonly referred to as "*Terry* stops," which must be supported by a police officer's reasonable, articulable suspicion of criminal activity; and (3) consensual encounters that involve no detention or coercion by the police, and, thus, do not implicate fourth amendment interests. *People v. Luedemann*, 222 Ill. 2d 530, 544 (2006).

11

¶ 35    Similar to *Luedemann*, the critical issue in this case is the timing of the seizure. See *Luedemann*, 222 Ill. 2d at 543. Defendant contends that he was immediately seized by the officers as soon as they arrived on the scene. Conversely, the State asserts that the encounter between defendant and the police was consensual and that defendant was not seized until he was handcuffed after the narcotics were recovered.

¶ 36    A person is "seized" when an officer has in some manner restrained the citizen's liberty by physical force or show of authority. *Luedemann*, 222 Ill. 2d at 550. A consensual encounter, on the other hand, does not involve coercion or detention, and, therefore, does not constitute a seizure. *Luedemann*, 222 Ill. 2d at 544.

¶ 37    Our supreme court has identified different tests for determining whether a person is seized based upon the circumstances of the encounter. See *Luedemann*, 222 Ill. 2d at 550-51. Where police approach a person sitting in a parked vehicle, the appropriate test is whether a reasonable innocent person would believe that he is " 'free to decline the officer's requests or otherwise terminate the encounter.' " *Luedemann*, 222 Ill. 2d at 550-51 (quoting *Florida v. Bostick*, 501 U.S. 429, 436 (1991)). However, when the person is walking down the street, the appropriate test is whether a reasonable innocent person would feel free to leave under the circumstances. *Luedemann*, 222 Ill. 2d at 550-51 (citing *United States v. Mendenhall*, 446 U.S. 544 (1980)). This analysis requires an objective evaluation of the police officer's conduct, not the subjective perception of the person involved. *Luedemann*, 222 Ill. 2d at 551. An officer may approach an individual and ask questions without turning the encounter into a seizure, and may even request identification or permission to search his luggage " 'as long as the police do not convey a message that compliance with their requests is required.' " *Luedemann*, 222 Ill. 2d at 551 (quoting *Bostick*, 501 U.S. at 434-35).

¶ 38    In *People v. Murray*, 137 Ill. 2d 382, 390 (1990), our supreme court adopted the following four factors identified by the *Mendenhall* court as indicative of a seizure: (1) the threatening presence of several police officers, (2) an officer's display of a weapon, (3) an officer's physical touching of the person, and (4) the use of language or tone of voice which indicates that compliance with the officer's request may be compelled. *Luedemann*, 222 Ill. 2d at 553. These factors illustrate the type of police conduct that would give a reasonable person an objective reason to believe that he was not free to leave or free to decline the officer's requests. *Luedemann*, 222 Ill. 2d at 555.

¶ 39    In this case, evaluating Investigator Gena's conduct with an objective view, we find that the evidence shows that Investigator Gena immediately seized defendant when he arrived at the scene. Investigator Gena testified that after he drove past defendant, who was sitting in a parked vehicle, he looked in his rearview mirror and observed defendant exiting his vehicle. The investigator then turned his vehicle around and pulled up behind defendant's vehicle. As defendant began walking eastbound, Investigator Gena exited his vehicle and said "[p]olice, can I talk to you?" The officer then walked to where defendant's vehicle was parked. When defense counsel asked "did you tell him to come here to where you were at," Investigator Gena testified "[y]es." After defendant complied and returned to where the officers were standing, Investigator Gena asked him what he was doing at that location.

¶ 40    Significantly, Investigator Gena acknowledged that defendant was not committing a crime; however, when asked if defendant was "free to leave" at that time, Investigator Gena expressly testified "[a]t that moment, no." When asked why, Investigator Gena testified that it was because defendant was parked in front of an abandoned building in a high-crime narcotics area and the officer wanted to verify what he was doing there. Defendant also testified that the

two officers inside the police vehicle asked him to "come here" and that he did not feel free to leave at that time.

¶ 41    We find that this testimony from both Investigator Gena and defendant clearly establishes that defendant was not free to leave and that defendant's compliance with Investigator Gena's requests to stop, return to the vehicle, and answer the officer's questions was required. *Luedemann*, 222 Ill. 2d at 551. Furthermore, when considering the *Mendenhall* factors, we find that although there were only two officers present, and they did not display their weapons or physically touch defendant, Investigator Gena's testimony shows that he used language or tone of voice to compel defendant's compliance with his requests, and, in doing so, conveyed to defendant that he was not free to leave or decline those requests. We therefore conclude that the record shows that the officers restrained defendant's liberty by a show of authority as soon as they arrived on the scene, and thus, defendant was immediately seized.

¶ 42                                II. Reasonable Suspicion

¶ 43    Having found that defendant was seized, we must next determine whether the officers had reasonable suspicion that he was committing a crime to justify the seizure. Defendant contends that the officers had a "total lack of reasonable suspicion." The State, on the other hand, asserts that Investigator Gena had reasonable suspicion because defendant was sitting alone in a parked vehicle on a residential street in a high-crime area where the investigator had previously executed search warrants and made numerous narcotics arrests, and after making eye contact with the officers, defendant immediately exited his vehicle and walked in the opposite direction.

¶ 44    The reasonableness of a seizure is analyzed according to the principles set forth by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). *People v. Timmsen*, 2015 IL 118181, ¶ 9. Pursuant to *Terry*, a police officer may conduct a brief, investigatory stop when he

reasonably infers from the circumstances that the person is committing, is about to commit, or has committed a criminal offense. *Timmsen*, 2015 IL 118181, ¶ 9 (citing *Terry*, 392 U.S. at 22, and *Close*, 238 Ill. 2d at 505). See also 725 ILCS 5/107-14 (West 2010) (codifying the *Terry* principles). The officer must have a "reasonable, articulable suspicion" that the person is engaged in criminal activity, and although that suspicion need not rise to the level required for probable cause, it must amount to more than an "inchoate and unparticularized suspicion or hunch." (Internal quotation marks omitted.) *Timmsen*, 2015 IL 118181, ¶ 9 (citing *Terry*, 392 U.S. at 27); *Close*, 238 Ill. 2d at 505.

¶ 45    "The investigatory stop must be justified at its inception, and the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the governmental intrusion upon the constitutionally protected interests of the private citizen." *Timmsen*, 2015 IL 118181, ¶ 9 (citing *Terry*, 392 U.S. at 20-21). The officer's conduct is judged by an objective standard by considering whether " 'the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate.' " *Timmsen*, 2015 IL 118181, ¶ 9 (quoting *Terry*, 392 U.S. at 21-22, quoting *Carrol v. United States*, 267 U.S. 132, 162 (1925)). When making this determination, we consider the totality of the circumstances as a whole. *Timmsen*, 2015 IL 118181, ¶ 9. A person's mere presence in a high-crime area, standing alone, is not sufficient to support a reasonable, particularized suspicion that he is committing a crime. *Timmsen*, 2015 IL 118181, ¶ 13.

¶ 46    Here, the record reveals that the officers lacked reasonable suspicion that defendant was committing a crime, and thus, the seizure was illegal. At the hearing on defendant's motion to suppress, Investigator Gena acknowledged that when he turned his vehicle around and pulled up

behind defendant's vehicle, defendant was not committing a crime at that time and there was no outstanding warrant for his arrest. The investigator again acknowledged that when he asked to speak with defendant, asked defendant to come to him, and asked defendant what he was doing at that location, defendant was not committing a crime at that time. Nonetheless, Investigator Gena testified that defendant was not free to leave at that moment, and thus, as discussed above, defendant was seized at this time.

¶ 47    When defense counsel asked Investigator Gena why defendant was not free to leave, the officer testified that it was because defendant was parked in front of an abandoned building in a high-crime narcotics area and he wanted to verify what defendant was doing at that location. Investigator Gena added that he had previously executed search warrants and made numerous narcotics arrests on that block. We find that Investigator Gena's explanation did not point to specific and articulable facts that gave him reasonable suspicion that defendant was committing, was about to commit, or had committed a crime. Defendant's mere presence in the high-crime area, standing alone, was not sufficient to give the officers reasonable suspicion that he was engaged in criminal activity.

¶ 48    Based on our findings, we conclude that the officers' seizure of defendant violated his fourth amendment rights. We therefore reverse the trial court's denial of defendant's motion to quash arrest and suppress evidence. It thus follows that the narcotics recovered from the vehicle defendant was driving are suppressed, and without this evidence, defendant's conviction for possession of a controlled substance with intent to deliver cannot stand. Accordingly, we reverse defendant's conviction.

¶ 49                              III. Reasonable Doubt and Challenged Testimony

¶ 50    Defendant also contends that the State failed to prove him guilty beyond a reasonable doubt because it failed to establish his knowledge that the drugs were present in the vehicle and his intent to deliver the drugs. In addition, defendant contends that he is entitled to a new trial because Investigator Gena's testimony that defendant's wife's name was on an insurance card found inside the vehicle and that she owned the vehicle was not based on the officer's personal knowledge and should have been excluded. In light of our holding above reversing defendant's conviction, we need not address these issues. See *Timmsen*, 2015 IL 118181, ¶ 21 (reviewing court will not decide nonessential issues or render advisory opinions).

¶ 51                                          CONCLUSION

¶ 52    For these reasons, we reverse the trial court's denial of defendant's motion to quash arrest and suppress evidence, thereby suppressing the narcotics, and reverse defendant's conviction.

¶ 53    Reversed.