2020 IL App (1st) 180496-U

No. 1-18-0496

Order filed June 11, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 14 CR 01980 02 |
| | ) | |
| SALVADOR GUTIERREZ, | ) | Honorable |
| | ) | William Hooks, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice Gordon and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the jury's verdict and the trial court's sentence over defendant's contentions that the court erred in denying his motion to suppress, that the jury's verdict was against the manifest weight of the evidence, that the court erred in denying his posttrial motions, and that his sentence was excessive.

¶ 2    Following a jury trial, defendant, Salvador Gutierrez, was found guilty of dismembering a human body (720 ILCS 5/12-20.5 (West 2016)) and concealment of homicidal death (720 ILCS 5/9-3.4(a) (West 2016)). At a subsequent sentencing hearing, the court sentenced defendant to a term of imprisonment of 20 years. The evidenced adduced at defendant's trial showed that

defendant returned home one evening to find the body of Jose Reyes lying on a bed in one of the bedrooms. Defendant's daughter, Daisy Gutierrez (Daisy) and her boyfriend, Milton Miranda, instructed defendant to help them dispose of the body. Defendant helped Miranda carry the body to the back room of the house on a piece of carpet. Defendant then dug a hole in the back yard of his house while Miranda dismembered the body in the back room using defendant's tools. Defendant then helped Daisy and Miranda place the dismembered body parts into garbage bags and bury them in the back yard.

¶ 3     Nearly five months later, acting on information obtained from Daisy, Chicago police officers recovered Reyes' dismembered body from the hole in the back yard of defendant's house and arrested defendant. Defendant was taken to the police station where he gave a statement to police officers and an assistant State's attorney (ASA) regarding his involvement in the dismemberment and concealment of Reyes' body.

¶ 4     Prior to his trial, defendant filed a motion to suppress his statements to the police officers, which the trial court denied. Following a jury trial, based on the testimony of police officers, defendant's family, including defendant himself, and stipulated testimony from various forensic scientists, the jury found defendant guilty of dismembering a human body and concealment of homicidal death. The court sentenced defendant to 15 years' imprisonment on the dismembering a human body count and 5 years on the concealment of a homicidal death count, for a total term of imprisonment of 20 years.

¶ 5     On appeal, defendant contends that the court erred in denying his motion to suppress his custodial statements. He further contends that the jury's verdict was against the manifest weight of the evidence and that the jury erred in rejecting his affirmative defense of compulsion. Defendant also asserts that the court erred in denying his posttrial motion for a judgment

notwithstanding the verdict. Finally, defendant contends that his sentence his excessive and in violation of the proportionate penalties clause of the Illinois constitution. For the reasons that follow, we affirm the jury's verdict and the judgment of the circuit court.

¶ 6                                  I. BACKGROUND

¶ 7                                A. Motion to Suppress

¶ 8      Prior to trial, defendant filed a motion to suppress his custodial statements. In his motion, defendant contended that while he was detained by Chicago police detectives, he refused to answer questions or give any statement about the incident. Instead, defendant told the officers that he needed to have his attorney present. Several hours later, the detectives again approached defendant in an effort to obtain a statement from him regarding his involvement in Reyes' death. Defendant again requested to have an attorney present, but the detectives continued to "badger and harass" defendant, and eventually "over[bore] his will" and obtained a statement from him regarding the dismemberment and concealment of Reyes' body. Defendant asserted that the detectives thus impermissibly coerced a statement from him despite his repeated requests to have an attorney present before he would answer any questions. Defendant contended that the court should therefore suppress the statements he made to the detectives on October 4 and 5, 2013, at the Chicago police department (CPD) station.

¶ 9      Prior to a hearing on defendant's motion, defendant requested a conference pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 2012). At the hearing, defense counsel asserted that defendant's actions were driven by Miranda who threatened defendant and forced him to participate in the dismemberment of the body and the concealment of the homicide. Defense counsel also outlined defendant's lack of criminal background and represented that he had a stable family and employment. Following the hearing, the court offered defendant a sentence of 14 years

imprisonment in exchange for a guilty plea. Defendant chose to not accept the plea agreement and proceeded with his motion to suppress his statements.

¶ 10     At the suppression hearing, Chicago police detective Marc Leavitt testified that on October 4, 2013, after his partner, Detective Gregory Andras, had a conversation with Daisy, they travelled to her residence in Chicago. Detective Leavitt learned that there might be an individual buried in the back yard of the residence. After obtaining a warrant, Detective Leavitt and other CPD officers started to dig in the back yard until they encountered a "horrific smell" and a black garbage bag. One of the detectives recovered what Detective Leavitt believed was human flesh inside the garbage bag. The detectives called the crime lab to continue the dig.

¶ 11     Based on Detective Andras' conversation with Daisy and the contents the officers recovered from the back yard of the residence, Detective Leavitt attempted to locate defendant. Detective Leavitt located defendant at his place a work and placed him under arrest. Detective Leavitt spoke to defendant in English and defendant responded to him in English. Detective Leavitt placed defendant in custody and Detective Andras advised defendant of his *Miranda* rights. Defendant indicated that he understood his rights. The detectives told defendant that they did not want to talk to him in the police vehicle, so they should wait until they got to the police station to talk.

¶ 12     When they arrived at the police station, the detectives placed defendant in an interview room. Detective Leavitt testified that he and Detective Andras spoke to defendant in the interview room and defendant told them his "whole story, chapter and verse." The detectives began speaking with defendant around 2 p.m. and spoke with him for about eight hours. Defendant did not initially request to speak to an attorney, but at around 10:40 p.m., defendant asked for an attorney. After

defendant requested an attorney "all questioning stopped." Detective Leavitt testified that neither he nor Detective Andres "badgered or harassed" defendant during the interview.

¶ 13    The next day, October 5, 2013, at around 6:30 p.m., defendant knocked on the door to the interview room and asked if he could speak to Detective Andras. Detective Andras told defendant that he had already requested to be represented by an attorney and read him his *Miranda* rights again. After defendant indicated that he understood his right, he asked if he could speak to somebody who spoke Spanish. Detective Andras retrieved Detective Hector Alvarez because he was the only Spanish speaker available at the time. Detective Alvarez asked defendant in Spanish if he understood the rights Detective Andras had read to him and defendant indicated that he did. Defendant then spoke to Detective Andras with Detective Alvarez translating for about 10 minutes. An assistant State's attorney (ASA) then entered the interview room and Detective Alvarez and the ASA spoke to defendant. The ASA read defendant his *Miranda* rights in Spanish.

¶ 14    The State rested and the defendant testified on his own behalf. Defendant testified that when he was arrested, he was told that he had the right to remain silent and that anything he said could be used against him in court, but the officers did not tell him that he had the right to the presence of an attorney or that if he could not afford an attorney, one would be appointed for him. When they arrived at the police station, defendant sat in the interview room for two or three hours before the officers spoke to him. Defendant testified that he did not know what was happening, so he asked to speak with someone who spoke Spanish. The detectives started asking defendant questions, but defendant told them he wanted an attorney present.

¶ 15    The detectives told him he did not need an attorney because his daughter had already said where the body was. Nonetheless, defendant told the detectives that he would not speak to them unless an attorney was present. The detectives "shook their heads" and then left defendant in the

interview room for a couple hours. The detectives returned and told defendant that the State's attorney was coming to take his deposition. Defendant told them that he was not ready to give a statement because he needed an attorney present. The detectives presented defendant with a picture of Reyes, asked defendant if he knew Reyes, and asked him to sign the picture. Defendant told the officers he wanted to speak to an attorney before he signed the picture, but they told him that it "was just one signature, to testify to the effect that I know him." Defendant testified that he had only seen Reyes once, but he signed the picture.

¶ 16 Defendant testified that the officers never told him that they would provide him with an attorney and he never knocked on the door and asked to speak with the officers. Defendant testified that the ASA was present when the officers asked him to sign the picture of Reyes and he asked for an attorney.

¶ 17 On cross-examination, defendant testified that when he spoke to the ASA, she told him that he had the right to remain silent and that anything he said could be used against him in a court of law, but she did not tell him that he had a right to his own attorney. She also did not tell defendant that if he could not afford an attorney, one would be appointed for him. Defendant testified that neither the ASA or the detectives ever badgered, harassed, or yelled at him.

¶ 18 The record indicates the ASA was called to testify regarding her involvement with defendant's interview at the police station, but her testimony is not included in the record filed on appeal.

¶ 19 In ruling on defendant's motion, the circuit court found that Detective Andras gave defendant his "proper and complete" *Miranda* warnings and defendant voluntarily waived his rights. The court then recounted the testimony of the detectives and the ASA and found their testimony credible regarding defendant's waiver of his *Miranda* rights. The court found that

defendant's testimony at the suppression hearing was "disjointed" and not credible. The court also found that there was no evidence that defendant's statement was given involuntarily. The court noted that defendant was read his rights in both English and Spanish and conversed with the officers and ASA in both English and Spanish.[1] Accordingly, the court denied defendant's motion to suppress his statements.

¶ 20                                 B. Defendant's Jury Trial

¶ 21                                    1. *State Witnesses*

¶ 22    Detective Leavitt testified consistently with his testimony at the suppression hearing regarding the execution of the warrant at defendant's residence and the discovery of the human remains at the excavation site in defendant's back yard. He also testified consistently regarding defendant's arrest and subsequent interview at the police station. Detective Levitt outlined his and Detective Andras' conversation with defendant. Defendant told the detectives that on the day of incident, Miranda was at his house and that Daisy was "having trouble" with Reyes. Miranda told defendant that he was going to take care of it and sent defendant, defendant's wife, and some of defendant's children and grandchildren out of the house to the park. When defendant returned from the park, Miranda brought him into Daisy's bedroom where he saw Reyes lying on the bed with blood everywhere.

¶ 23    Defendant told the detectives that he and Miranda placed Reyes' body on a piece of carpet and dragged the body into the back room of the house. Miranda directed defendant to dig a hole in the back yard and defendant complied. It took defendant two or three hours to dig the hole. While defendant was digging the hole, Miranda was dismembering the body in the back room. Once he

---

[1]The court's ruling indicates that the ASA testified that she spoke both English and Spanish and advised defendant of his *Miranda* rights in both English and Spanish prior to taking his statement.

finished digging the hole, defendant joined Miranda in the back room where he saw that Miranda had cut the head and arms off of Reyes' torso and was in the process of removing Reyes' legs. Miranda and Daisy then held open black garbage bags and defendant scooped up body parts and placed them into three separate garbage bags. Defendant carried each of the bags on three separate trips to the hole that he dug in the back yard. Defendant, Miranda, and Daisy then filled the hole. Defendant, his wife, Daisy, and Miranda then cleaned up the blood in the house. Defendant told Detective Leavitt that he kicked Daisy and Miranda out of his house the next day.

¶ 24     On cross-examination, Detective Leavitt testified that defendant told him that Miranda was part of a gang called the Zetas and that defendant was scared of him. Detective Leavitt testified that the Zetas are a gang from El Salvador and there a few of them in the Chicagoland area. Defendant also said that Miranda told him that he had a lot of friends and defendant would be in trouble with them and the police if he did not help dispose of the body. Miranda told defendant that if he did not go into the back yard and dig a hole, defendant would also go to jail.

¶ 25     Detective Alvarez testified consistently with his testimony at the suppression hearing regarding his role in defendant's interview at the police station. Detective Alvarez testified that when he spoke to defendant in Spanish, defendant repeated the version of events he told Detective Leavitt. Defendant told Detective Alvarez that he and Miranda dragged the body to the back room of the house, that he dug the hole in the back yard, that Miranda dismembered the body, that the body parts were placed into black garbage bags, and that the garbage bags were buried in the hole in the back yard. Defendant wanted to speak to Detective Alvarez in Spanish because he wanted to clarify what he had told Detective Leavitt in English.

¶ 26     Defendant told Detective Alvarez that Daisy told him he needed to keep quiet about the incident because Miranda could do the same thing to him. Defendant further elaborated that

Miranda and Daisy told him that Miranda was a member of the Zetas gang and they "do this all the time," so defendant should not tell anyone what happened. Defendant told Detective Alvarez that Miranda said he was from the Zetas and then took a knife and cut the letter "Z" into the victim's body. Defendant said that after they buried the body in the back yard, he and his wife kicked Daisy and Miranda out of the house.

¶ 27    CPD Forensic Investigator Zbigniew Niewdech testified that on October 4, 2013, he was called to defendant's residence after human remains were found in a plastic bag. Niewdech photographed the site and participated in excavating the site and identifying the human remains. While searching the home, Niewdech discovered dried blood stains and noted that one of the bedrooms had recently been painted.

¶ 28    Chicago police detective Hector Matias testified that he was assigned to investigate Reyes' disappearance. During the course of his investigation, he spoke to Daisy and subsequently arrested her. After Daisy was arrested, Detective Matias traveled to New Jersey where he arrested Miranda. On cross-examination, Detective Matias testified that the Zetas were not present in the Chicago area.

¶ 29                             2. *Defense Witnesses*

¶ 30    Defendant's wife, Adelaida Camacho, testified on defendant's behalf that neither Daisy nor Miranda lived at defendant's home at the time of the incident. Camacho testified that on the night of the incident, she left her home to go Walgreens with defendant and her son and grandchildren. When they returned home, someone grabbed defendant. Camacho was going to call the police, but someone else grabbed her phone. Camacho did not know who the people were, but one of them had a "Z" on his neck and two teardrop tattoos on his face. The two men were screaming and threatening them, so Camacho put the children into one of the bedrooms. On cross-

examination, Camacho testified that Daisy was not living with her and defendant on the night of the incident.

¶ 31    Christopher Gutierrez (Christopher), defendant's 16-year-old son[2], testified on defendant's behalf that on the night of the incident, he went to the store with his family. When they returned home, Camacho directed him into one of the bedrooms. While he was in the bedroom, he heard a man saying, "I'm going to kill you and the cat too." Christopher did not come out of the bedroom until the next day.

¶ 32    Defendant testified on his own behalf that everything the detectives testified that defendant told them during the interviews at the police station was true. Defendant then testified regarding his knowledge of the Zetas. Defendant testified that they were a cartel from Central America and that they dismember the people they kill. Defendant testified that at the time of trial, he was still afraid of Miranda and the Zetas. On cross-examination, defendant recounted his involvement in the incident, including seeing the body in the bedroom of his home, helping Miranda carry the body to the back room on a piece of carpet, digging the hole in the back yard, and helping to bury the body. Defendant testified that all of the tools Miranda used to dismember the body belonged to defendant. Defendant further testified that after they finished burying the body, he told Daisy and Miranda to leave his house because he was going to call the police. Defendant did not call the police, however, because he was afraid.

¶ 33    Following closing argument, the jury found defendant guilty of dismembering a human body and concealment of a homicidal death. Defendant filed a posttrial motion for a judgment notwithstanding the verdict or in the alternative a motion for a new trial. In the motion, defendant

___

[2] Christopher was 13 years old on the night of the incident.

contended that he did not receive a fair and impartial trial, that the finding was against the manifest weight of the evidence, that defendant was denied due process of law, and that he was denied equal protection of the law. In denying defendant's motion, the court found that there was proof beyond a reasonable doubt for the jury's verdict.

¶ 34    Defendant's cause then proceeded to sentencing. After considering the arguments in mitigation and aggravation and defendant's statement in allocution, the court sentenced defendant to 15 years' imprisonment on the dismembering a human body count and 5 years on the concealment of a homicidal death count. Pursuant to section 5-8-4(d)(5) of the Unified Code of Corrections (730 ILCS 5/5-8-4(d)(5) (West 2016)) the two terms of imprisonment were required to be served consecutively, resulting in a total term of imprisonment of 20 years.

¶ 35    In determining that sentence, the trial court found there was insufficient evidence presented regarding the Zetas and that "this [was] no different than any other homicide." The court noted that defendant came home to see his daughter and her boyfriend with a dead body in the process of being dismembered. The court found that this was "a common sense situation." The court stated that if defendant were being forced to participate in this situation, the court needed to hear more evidence of force. The court found that it "[s]ounded as if [defendant] had signed on to this situation." The court further found that there was no evidence of defendant discussing with his daughter how bad the situation was. The court found that although defendant did not commit the homicide, he was "extremely active" in the dismemberment and burial of the body and the concealment of the homicide.

¶ 36    Defendant subsequently filed a motion to reconsider his sentence. In denying that motion, the court stated that defendant's belief that he acted under fear was not credible given the fact that defendant did not seem to be fearful of Miranda after the incident because he told Miranda and

Daisy to leave his house. The court noted that even after Miranda fled the jurisdiction, defendant did not inform law enforcement about the incident. This appeal follows.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, defendant contends that the court erred in denying his motion to suppress where defendant requested the presence of counsel, but the detectives questioned defendant anyway and overbore his will to obtain an inculpatory statement. Defendant further contends that the jury's verdict was against the manifest weight of the evidence where all of the evidence of defendant's involvement in the incident came from his own statements to law enforcement. Defendant asserts that the jury also erred in rejecting his affirmative defense of compulsion where his unrebutted evidence showed that he was afraid of Miranda and that Miranda forced him to participate in the offense. Defendant also contends that the court erred in denying his posttrial motion for a judgement notwithstanding the verdict. Finally, defendant contends that his sentence was excessive, that the court was inappropriately "inflamed by passion and prejudice" in determining his sentence, and that his sentence violated the proportionate penalties clause of the Illinois constitution.

¶ 39                              A. Motion to Suppress

¶ 40    Defendant first contends that the court erred in denying his motion to suppress the statements he made to the detectives following his arrest. Defendant asserts that his testimony demonstrated that the police officers improperly questioned him and obtained inculpatory statements after he requested the presence of an attorney. Defendant maintains that the court credited the officer's testimony regarding the interview, but "selectively disbelieved" defendant's testimony that he requested counsel.

¶ 41                              1. *Standard of Review*

¶ 42    In reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). We will reverse the trial court's factual findings only if they are against the manifest weight of the evidence, but we review *de novo* the trial court's ultimate ruling as to whether suppression is warranted. *People v. Williams*, 2016 IL App (1st) 132615, ¶ 32. The defendant, not the State, bears the burden of proof on a motion to suppress. See, *e.g.*, *People v. Cregan*, 2014 IL 113600, ¶ 23. At a hearing on a motion to suppress evidence, the trial court is responsible for determining the credibility of the witnesses, weighing the evidence, and drawing reasonable inferences therefrom. *Williams*, 2016 IL App (1st) 132615, ¶ 32 (citing *People v. Ballard*, 206 Ill. 2d 151, 162 (2002)).

¶ 43                                    2. *Credibility*

¶ 44    Here, we find that defendant has not satisfied his burden of proof to establish that the trial court should have granted his motion to suppress. Defendant's primary contention seems to be that the trial court credited the officer's testimony regarding the interview rather than his. This is precisely the trial court's prerogative. Defendant is essentially asking this court to reweigh the evidence and credit his testimony over the testimony of the police officers, but that is not this court's role. *People v. Hernandez*, 267 Ill. App. 3d 429, 432 (1994). Instead, we afford great deference to the trial court's factual findings because it was in a superior position to determine and weigh the credibility of the witnesses, observe the demeanor of the witnesses, and resolve conflicts in their testimony. *People v. Sandifer*, 2017 IL App (1st) 142740, ¶ 63 (citing *People v. Richardson*, 234 Ill. 2d 233, 251 (2009)).

¶ 45    In this case, the trial court stated in denying defendant's motion to suppress that defendant's testimony at the suppression hearing was "disjointed" and not credible. As a result, the court found that, based on the testimony of the police officers, defendant was given his "proper and complete"

*Miranda* warnings and defendant voluntarily waived his rights. Defendant maintains, however, that it is "nonsensical" that he would speak to the officers for hours before requesting an attorney and then choose to talk to the officers again after requesting an attorney. We find nothing inherently illogical about that chain of events, and neither did the trial court. Indeed, there are numerous appellate court cases examining this exact situation. In such circumstances, there is no constitutional violation where the defendant, rather than the officers, initiates the conversation after the request for counsel has been made. See, *e.g.*, *People v. Miller*, 393 Ill. App. 1060, 1064-65 (2009) (and authority cited therein). Here, the officers' testimony, which the trial court found credible, demonstrated that after requesting counsel, defendant initiated a conversation with the officers the next day because he wished to speak to someone in Spanish. At that time, the officers informed defendant of his rights again, and defendant voluntarily waived them. We find this chain of events was not "nonsensical" and did not render defendant's statements to police involuntary. Accordingly, we find that the trial court did not err in denying defendant's motion to suppress.

¶ 46                                B. The Jury's Verdict

¶ 47    Defendant next contends that the jury's verdict on the dismembering of a human body count was against the manifest weight of the evidence. Defendant asserts that all of the evidence of his culpability came from his own statements to police, which did not establish his accountability for Miranda's and Daisy's actions. Defendant maintains that the evidence of his accountability was unsatisfactory where there was no evidence showing that he participated in planning the crime or that he shared a criminal intent or design with Miranda or Daisy. Defendant also contends that the jury erred in rejecting his "unrebutted evidence" of compulsion. Defendant asserts that his testimony as to the threats Miranda made to him when he arrived home to see Reyes' body were never impeached nor discredited.

¶ 48                                          1. *Defendant's Guilt*

¶ 49     Where a defendant challenges the sufficiency of the evidence to sustain his conviction, the reviewing court must consider whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). This standard recognizes the responsibility of the trier of fact to determine the credibility of the witnesses and the weight to be given their testimony, to resolve any conflicts and inconsistencies in the evidence, and to draw reasonable inferences therefrom. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). A reviewing court must allow all reasonable inferences from the record in favor of the prosecution, and will not overturn the decision of the trier of fact unless the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011); *People v. Smith*, 185 Ill. 2d 532, 542 (1999).

¶ 50     Here, defendant contends that the State failed to prove him guilty beyond a reasonable doubt where there was "no evidence to establish that he participated in planning or perpetrating the crime." Defendant asserts that he did not participate in the actual dismemberment of the body and the State's evidence of accountability was lacking because it failed to show that defendant intended to promote or facilitate the dismemberment or that he shared a common criminal intent or design with Daisy and Miranda.

¶ 51     We reject defendant's argument. Section 5-2(c) of the Criminal Code of 2012 provides that a person is legally accountable for the criminal conduct of another if "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2 (West 2016). That section further provides that "any acts in the

furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts." *Id.*

¶ 52    Here, we find that although defendant did not directly participate in dismembering the body, "before, during or after" the commission of the offense, the evidence presented showed that defendant acted with the "intent to promote or facilitate" the commission of the offense by aiding in its commission. By defendant's own statements to police, which defendant testified were accurate, defendant helped Miranda carry the body on a piece of carpet to the back room of his home, allowed Miranda to use his tools to dismember the body, dug a hole in the back yard for three hours, aided Miranda and Daisy in placing the dismembered body parts into plastic garbage bags, carried the garbage bags to the back yard, and helped bury the garbage bags in the in the hole that defendant dug. Defendant never attempted to flee the scene or contact police despite testimony that defendant was in the back yard, alone, for two or three hours while he dug the hole. Defendant knew Miranda had murdered Reyes, but helped him dismember and bury the body anyway. Defendant asserts that "the jury conflated Defendant's purported conduct in Concealment of Human Remains with Dismemberment of a Human Corpse," but we find no support for this argument in the record and defendant does not elaborate on this contention. Accordingly, we find no merit to this argument. Under these circumstances, we find ample evidence to support the jury's verdict that the State proved defendant guilty of dismembering a human body beyond a reasonable doubt.

¶ 53                              2. *Compulsion*

¶ 54    Defendant contends, however, that the jury failed to recognize his unrebutted evidence that he was compelled by threats of force to aid in the crime. Defendant asserts that he testified he was

afraid of Miranda because of his involvement in the Zetas, "a murderous gang." Defendant asserts that his testimony regarding Miranda's threats of harm were unrebutted and the evidence supporting the defense of compulsion was overwhelming. Defendant asserts that the jury should have credited this defense, which would have negated the dismembering a human body charge.

¶ 55    Interestingly, many of defendant's arguments in this section of his brief relate to the trial court's comments regarding defendant's compulsion defense. Defendant asserts that the trial court "went to great lengths to cast doubt on defendant's evidence of compulsion" and dismissed defendant's evidence that the Zetas were active in Chicago. We fail to find the relevance of these arguments to this issue where the record shows that the court did not make any comments disparaging defendant's compulsion defense or evidence of the Zetas in the jury's presence. In fact, the court gave the jury a compulsion instruction over the State's objection. In overruling the State's objection, the court stated that "there could be an interpretation that makes this [defense] extremely relevant for the Defense's theory. There is some evidence that makes it appropriate if the Defense would like to argue it." Defendant then presented his compulsion defense to the jury without intervention by the circuit court. Thus, we fail to see the relevance of the trial court's comments made outside the presence of the jury to this contention.

¶ 56    Furthermore, it is immaterial whether defendant's testimony that he was afraid of Miranda because of his possible affiliation with the Zetas was unrebutted. The jury's verdict suggests that it either did not find defendant's testimony credible or that it did not believe defendant's testimony, even if credible, was sufficient to establish a compulsion defense.

¶ 57    In order for defendant to establish his compulsion defense, he was required to show that he acted under "threat or menace of the imminent infliction of death or great bodily harm" or reasonably believed "death or great bodily harm will be inflicted upon him or her." 720 ILCS 5/7-

11(a) (West 2016). Here, defendant did not testify that he acted out of fear of any imminent harm or that the harm inflicted would be "great" or cause his death. He merely testified to a nebulous fear of some future harm because he believed Miranda was a member of the Zetas. Coupled with the testimony of some of the police officers that the Zetas were not present in the Chicago area, the jury was not required to credit this testimony and find that it negated defendant's participation in the dismemberment. Moreover, defendant told the detectives that he kicked Daisy and Miranda out of his house the day after the incident, suggesting that he was not too afraid of Miranda to tell him to leave his house. Defendant is essentially asking this court to reweigh the evidence presented in his favor, but this is not our prerogative. *Sutherland*, 223 Ill. 2d at 242. Instead, it was within the province of the jury, as the trier of fact, to accept or reject defendant's defense and where the evidence was not so overwhelming to suggest that the jury's verdict was unreasonable, we find no basis for reversing the jury's verdict. *Beauchamp*, 241 Ill. 2d at 8. Accordingly, we find the jury did not err in rejecting defendant's compulsion defense.

¶ 58                          C. Defendant's Posttrial Motions

¶ 59    Defendant next contends that the court erred in denying his posttrial motions for a judgment notwithstanding the verdict or a new trial. Defendant does not raise any new contentions in support of this argument, but reasserts the arguments made in support of his argument challenging the jury's verdict. He also, almost offhandedly, asserts that trial counsel's posttrial motion was "woefully deficient," but he does not raise a claim of ineffective assistance.

¶ 60    For the reasons stated in Section B, *supra*, we find defendant's challenge to the trial court's ruling on his posttrial motions unavailing. We find, however, this is a more appropriate section for this court to address defendant's contentions that the trial court improperly discredited his fear of Miranda and the Zetas. We recognize that the court commented that it did not believe defendant

presented sufficient evidence regarding Miranda's involvement with the Zetas. We fail to see, however, how these comments reflect any impropriety or represent any error, particularly where the court's comments were based on the evidence, or lack thereof, presented. The detectives testified that the Zetas were not present in the Chicago area and defendant presented no evidence to rebut that testimony. Defendant also testified that Miranda carved a Z into Reyes' body before they buried it in an effort to connect Miranda to the Zetas. Stipulated testimony from the Cook County medical examiner, however, revealed that there was no such abrasion found on Reyes' body. As such, it was reasonable for the court to reject this claim. Nevertheless, as noted, the court ultimately gave the jury an instruction regarding compulsion over the State's objection and allowed defendant to fully present the defense. The fact that defendant ultimately failed to prevail on that defense does not suggest any error. Accordingly, we find that the court did not err in denying defendant's posttrial motion for a judgment notwithstanding the verdict or a new trial.

¶ 61                                  D. Defendant's Sentence

¶ 62    Defendant next contends that his 15-year sentence on the charge of dismembering a human body is excessive. Defendant asserts that the evidence presented demonstrated that he was minimally involved in the offense and the court was "inflamed by passion and prejudice" against defendant in determining his sentence. Defendant also contends that his sentence violates the proportionate penalties clause of the Illinois constitution.

¶ 63                                     1. *Excessiveness*

¶ 64    Defendant first contends that his sentence of 15 years' imprisonment on the dismembering a human body charge was excessive. Defendant asserts that the evidence presented showed that he was minimally involved in the commission of the offense and was insufficient to justify the imposition of a sentence in the middle of the range for a Class X sentence.

¶ 65    In reviewing a defendant's sentence, a reviewing court will not alter a defendant's sentence absent an abuse of discretion by the trial court. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A sentence within the statutory range is not excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the offense. *People v. Fern*, 189 Ill. 2d 48, 54 (1999). The trial court is afforded such deference because it is in a better position than the reviewing court to weigh the relevant sentencing factors such as " 'defendant's credibility, demeanor, general moral character, mentality, social environment, and age.' " *People v. Stevens*, 324 Ill. App. 3d 1084, 1093-94 (2001) (quoting *People v. Streit*, 142 Ill. 2d 13, 19 (1991)).

¶ 66    Here, defendant was found guilty of dismembering a human body (720 ILCS 5/12-20.5 (West 2016)). Dismembering a human body is a Class X felony (720 ILCS 5/12-20.5(d) (West 2016)) which carries a sentencing range of 6 to 30 years' imprisonment (730 ILCS 5/5-4.5-25(a) (West 2016)). The court sentenced defendant to a 15-year term of imprisonment on the dismembering charge. The sentence thus fell within the prescribed statutory range. Based on the evidence presented regarding the details of the incident and defendant's participation in it, we cannot say that this sentence was greatly at variance with the purpose and spirit of the law or manifestly disproportionate to the offense. *Fern*, 189 Ill. 2d at 54.

¶ 67    Defendant contends, however, that the "record makes clear that the trial court improperly sentenced defendant on the Dismemberment charge based upon conduct relative only to the Class 3 Felony Concealment charge." Defendant does not cite to the record in support of this contention nor does he offer additional argument to support this point. The record reveals, however, no such improper sentencing structure. A review of the record indicates that defendant's contention may be based on the court's misstatement during sentencing that dismembering a human body was a class 3 felony. The ASA then corrected the court "The dismembering is a Class X. The

concealment is a class three." The court responded. "Dismember is a class X. I may have gotten it mixed up. Anyway, the class X speaks to the dismember of the body. The concealment is the class three." Other than this brief exchange correcting a misstatement by the court, there is simply nothing in the record to support defendant's contention or suggest the court considered any improper factors resulting in an excessive sentence. Accordingly, we find no abuse of discretion.

¶ 68                                    2. *The Court's Comments*

¶ 69    Defendant contends, however, that his sentence was excessive because the comments the court made in denying his motion to suppress and at the sentencing hearing indicated that the court was inflamed by "passion" and "enmity" against defendant. Defendant maintains that the court made statements indicating its disgust with defendant and its disbelief that defendant could have felt threatened or intimidated by Miranda. Defendant asserts that his sentence was therefore tainted by the court's personal disdain for him and its prejudice against him as a "derelict father."

¶ 70    Once again, defendant fails to support his arguments in this section with citations to the record. Supreme Court Rule 341(e)(7) (eff. May 25, 2018) requires parties to include citations to the record in the argument sections of their briefs. This court is "entitled to have issues clearly defined with pertinent authority cited and cohesive arguments presented [citation], and it is not a repository into which an appellant may foist the burden of argument and research." *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993). Defendant raises a contention based on the trial court's comments, but fails to provide a citation to precisely which comments defendant asserts were improper. Instead, defendant broadly asserts that the trial court was clearly influenced by passion and enmity because it voiced personal disdain for defendant's conduct, minimized defendant's fear of Miranda, and chastised defendant for failing as a father. Although we could find that defendant forfeited this argument or order defendant to file additional briefing (*People v. Johnson*, 192 Ill.

2d 202, 206-07 (2000)) as a result of his failure to provide record citations, we will nonetheless address defendant's arguments because this court has already extensively reviewed the record in order to respond to defendant's other contentions.

¶ 71 Our review of the record reveals that none of the court's comments demonstrate enmity or disdain for defendant as he suggests, but rather show the court's reasoning for its judgment and sentence. For instance, at defendant's sentencing hearing, the court stated that "[d]efendant's conduct on every level is atrocious. It's brutal in and of itself." The court later stated that "[d]ismembering of a human body is something that every religion in every part of the world going back to the beginning of time found horrible" and that "concealment of a homicide is one of the most serious offenses known to man." These comments do not reflect any personal disdain for defendant, but rather show the court's consideration of the seriousness of the offense. As this court has recognized, in determining the appropriate sentence "the most important factor to consider is the seriousness of the crime." *People v. Busse*, 2016 IL App (1st) 142941, ¶ 28. The court's comments in this case merely illustrate that the court found this to be a very serious offense, but do not show any personal prejudice toward defendant.

¶ 72 Similarly, there is no suggestion that the court minimized defendant's fear of Miranda such that it showed the court harbored animosity toward defendant. As noted, the court gave the jury a compulsion instruction, based on defendant's fear of Miranda, over the State's objection. In addition, at the hearing on defendant's posttrial motion for a judgment notwithstanding the verdict, the State suggested that defendant was not afraid of Miranda because he had pimples. The court found that argument unpersuasive because even though Miranda was young, he was larger than defendant and "there's a lot of murderers with pimples on [their] face[s]." The court did not baselessly downplay defendant's fear of Miranda, but instead noted that there was a factual basis

for jury's rejection of defendant's compulsion defense and the court agreed that defendant presented insufficient evidence to establish the defense. There was no suggestion of passion or enmity in the court's comments.

¶ 73    Finally, the court did make a number of statements regarding defendant's responsibilities as a father to his daughter, Daisy. The court stated that upon arriving home and seeing the body, defendant should have taken steps to extricate Daisy and himself from the situation. The court described the scene defendant saw when he returned home that night as a "common sense situation." The court's comments thus reflect that defendant, as a 54-year-old father, should have taken steps to take control of the situation his 19-year-old daughter and her young boyfriend had created. Instead, defendant capitulated and aided in the dismemberment of the body and the concealment of the murder. We find no suggestion of personal animosity stemming from the court's comments that defendant, as a mature adult, should have conducted himself in a different manner and helped his daughter rather than participate in the dismemberment and concealment. Accordingly, we find no indication that the court was inflamed by passion and enmity such that it abused its discretion in determining defendant's sentence.

¶ 74                    3. *Proportionate Penalties Clause*

¶ 75    Defendant finally contends that his sentence "was excessive in violation of the Proportionate Penalties Clause." Defendant essentially repeats the arguments made in support of his previous excessive sentence arguments, but further contends the trial court improperly compared his sentence to Daisy's, which defendant asserts is a violation of the proportionate penalties clause of the Illinois constitution.

¶ 76    The proportionate penalties clause provides that "[a]ll penalties shall be determined *** according to the seriousness of the offense." (Ill. Const. 1970, art 1, §11). A sentence violates the

proportionate penalties clause if: "(1) it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community; or (2) it is greater than the sentence for an offense with identical elements." *People v. Herron*, 2012 IL App (1st) 090663, ¶ 24. Essentially, [a] proportionality challenge contends that the penalty in question was not determined according to the seriousness of the offense." *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005).

¶ 77    Defendant fails to address how a comparison of one defendant's sentence to a co-defendant's violates the proportionate penalties. Indeed, this court has consistently found that there is no violation of a defendant's rights where co-defendants receive similar or dissimilar sentences. See, *e.g.*, *People v. Grisset*, 288 Ill. App. 3d 620 (1997). "A disparity in sentencing can be justified by differences in the nature and degree of the defendants' participation in the offense or differences in the codefendants' histories, characters, criminal records, potential for rehabilitation or relative maturity." *Id.* (citing *People v. Brown*, 267 Ill. App. 3d 482, 487 (1994)). Furthermore, as discussed, defendant's sentence is not "cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community" and it is not greater than the sentence for an offense with identical elements. *Herron*, 2012 IL App (1st) 090663, ¶ 24. In short, defendant's sentence is not disproportionate to the seriousness of the offense. Accordingly, we find that the trial court's sentence did not violate the proportionate penalties clause.

¶ 78                                III. CONCLUSION

¶ 79    For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 80    Affirmed.